**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MÁTAY GÁBOR, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| TRANSOCEAN LTD., JEREMY D. THIGPEN, MARK L. MEY, and THAD VAYDA, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Mátay Gábor ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Transocean Ltd. ("Transocean" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Transocean; and (c) review of other publicly available information concerning Transocean.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Transocean securities between October 31, 2023 and September 2, 2024, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Transocean, together with its subsidiaries, provides offshore contract drilling services for oil and gas wells worldwide. Transocean currently owns or operates a fleet of 34 mobile offshore drilling units, consisting of 26 ultra-deepwater floating rigs and eight harsh environment floating rigs. The Company's rigs are categorized as under contract, "idle," or "stacked." An "idle" rig is one being held between contracts and readily available for operations. A "stacked" rig, on the other hand, is minimally manned or unmanned and typically is expected to continue to be inactive for an extended period. The Company provides monthly fleet updates as to the status of its ships. As of October 18, 2023, the Company had 13 stacked or idle rigs. Of those 13, two were marked idle: the *Discoverer Inspiration* (as of April, 2023) and the *Development Driller III* (as of August, 2023).

3.      On September 3, 2024, before the market opened, Transocean announced "as part of the Company's effort to dispose of **non-strategic assets**" it had agreed to sell the *Development Driller III* and the *Discoverer Inspiration* and associated assets for an **aggregate $342 million**. The Company further announced that the sales would result in an estimated third-quarter non-cash charge of **up to $645 million associated with the impairment of said assets.** Otherwise stated, the Company's expected proceeds from the sale of the *Development Driller III* and the *Discoverer Inspiration,* was only approximately half the impairment the Company was required to take for the sale.

4.      On this news, the Company's share price fell $0.42, or 8.86%, to close at $4.32 per share on September 3, 2024, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the *Discoverer Inspiration* and the *Development Driller III* were considered non-strategic assets; (2) the Company's recorded asset valuations were overstated; (3) as a result, the Company would take nearly twice the vessels' sale price in impairment if sold;  and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Mátay Gábor, as set forth in the accompanying certification, incorporated by reference herein, purchased Transocean securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Transocean is incorporated under the laws of Switzerland with its principal executive offices located in Steinhausen, Switzerland. Transocean's shares trade on the New York Stock Exchange ("NYSE") under the symbol "RIG."

13.    Defendant Jeremy D. Thigpen ("Thigpen") was the Company's Chief Executive Officer ("CEO") at all relevant times.

14.    Defendant Mark L. Mey ("Mey") was the Company's Chief Financial Officer ("CFO") from May, 2015 until May 20, 2024.

15.    Defendant Thad Vayda ("Vayda") was the Company's CFO from May 20, 2024 onwards.

16.    Defendants Thigpen, Mey, and Vayda (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17.    Transocean, together with its subsidiaries, provides offshore contract drilling services for oil and gas wells worldwide. Transocean currently owns or operates a fleet of 34 mobile offshore drilling units, consisting of 26 ultra-deepwater floating rigs and eight harsh environment floating rigs. The Company's rigs are categorized as under contract, "idle," or "stacked." An "idle" rig is one being held between contracts and readily available for operations.

A "stacked" rig, on the other hand, is minimally manned or unmanned and typically is expected to continue to be inactive for an extended period. The Company provides monthly fleet updates as to the status of its ships. As of October 18, 2023, the Company had 13 stacked or idle rigs. Of those 13, two were marked idle: the *Discoverer Inspiration* (as of April, 2023) and the *Development Driller III* (as of August, 2023).

### Materially False and Misleading

### Statements Issued During the Class Period

18.    The class period begins on October 31, 2023. On that day, the Company announced its third quarter 2023, financial results in a press release for the period ended September 30, 2023. The press release reported the Company's third quarter 2023 adjusted net loss of $280 million. The press release quoted Defendant Thigpen as stating the Company[1] "***firmly believe[s] that we remain in the early stages of a multi-year upcycle***" and that, the Company's "***uniquely positioned to capitalize on current and future opportunities***" due to its "***fleet of the most capable high-specification ultra-deepwater drillships and harsh environment semisubmersibles.***" The press release reported the purported value of the Company's assets, stating as follows in relevant part:

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 594 | $ 683 |
| Accounts receivable, net of allowance of $2 at September 30, 2023 and December 31, 2022 | 532 | 485 |
| Materials and supplies, net of allowance of $206 and $199 at September 30, 2023 and December 31, 2022, respectively | 410 | 388 |
| Restricted cash and cash equivalents | 214 | 308 |
| Other current assets | 217 | 144 |
| Total current assets | 1,967 | 2,008 |
| | | |
| Property and equipment | 23,674 | 24,217 |
| Less accumulated depreciation | (6,761) | (6,748) |
| Property and equipment, net | 16,913 | 17,469 |
| Contract intangible assets | 11 | 56 |
| Deferred tax assets, net | 26 | 13 |
| Other assets | 1,091 | 890 |
| Total assets | $ 20,008 | $ 20,436 |

19.     On October 31, 2023, the Company submitted its quarterly report for the fiscal period ended September 30, 2023 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report touted the Company's strong market position, specifically citing high returns in projects "in deepwater and harsh environments" with projected "increased demand" to be "sustained in the coming years" especially for "offshore drilling rigs capable of operating in these markets." The quarterly report also described the Company's purported fair value measurements and the valuation of the Company's property and equipment. Specifically, the quarterly report stated, in relevant part:

> **Fair value measurements—*We estimate fair value at an exchange price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants.*** Our valuation techniques require inputs that we categorize using a three-level hierarchy, from highest to lowest level of observable inputs, as follows: (1) significant observable inputs, including unadjusted quoted prices for identical assets or liabilities in active markets ("Level 1"), (2) significant other observable inputs, including direct or indirect market data for similar assets or liabilities in active markets or identical assets or liabilities in less active markets ("Level 2") and (3) significant unobservable inputs, including those that require considerable judgment for which there is little or no market data ("Level 3"). When a valuation requires multiple input levels, we categorize the entire fair value measurement according to the lowest level of input that is significant to the

measurement even though we may have also utilized significant inputs that are more readily observable.

*                    *                    *

Our customers continue to pursue offshore projects in **_deepwater and harsh environments where rates of return and production volumes are anticipated to be very attractive,_** which is reflected in the resumption of postponed projects, commencement of new drilling and exploration campaigns and extensions of current drilling campaigns. **_Offshore drilling activity remains robust in every major ultra-deepwater geographic sector._**

*                    *                    *

**_As we project that this increased demand for both our asset groups will be sustained in the coming years,_** and as there are now fewer high-specification **_offshore drilling rigs capable of operating in these markets,_** we believe this demand may prompt the reactivation of cold stacked rigs and the delivery of remaining stranded newbuild assets.

20.    On February 19, 2024, the Company announced its fourth quarter and full year 2023, financial results in a press release for the fiscal year ended December 31, 2023. The press release reported the Company's fourth quarter 2023 adjusted net loss of $74 million. The press release quoted Defendant Thigpen as stating the Company was "very proud of our performance in 2023" and "remain[s] encouraged by the continued tightness in the market" "as we progress through what we expect to be a multi-year upcycle." The press release reported the purported value of the Company's assets, stating as follows in relevant part:

| | December 31, | |
|---|---|---|
| | 2023 | 2022 |
| **Assets** | | |
| Cash and cash equivalents | $ 762 | $ 683 |
| Accounts receivable, net | 512 | 485 |
| Materials and supplies, net | 426 | 388 |
| Restricted cash and cash equivalents | 233 | 308 |
| Other current assets | 193 | 144 |
| Total current assets | 2,126 | 2,008 |
| | | |
| Property and equipment | 23,875 | 24,217 |
| Less accumulated depreciation | (6,934) | (6,748) |
| Property and equipment, net | 16,941 | 17,469 |
| Contract intangible assets | 4 | 56 |
| Deferred tax assets, net | 44 | 13 |
| Other assets | 1,139 | 890 |
| Total assets | $20,254 | $20,436 |

21.    On February 20, 2024, the Company submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC, affirming the previously reported financial results (the "2023 10-K"). The 2023 10-K described the Company's purported fair value measurements and the valuation of the Company's property and equipment, stating in relevant part:

> **Fair value measurements—*We estimate fair value at an exchange price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants.*** Our valuation techniques require inputs that we categorize using a three-level hierarchy, from highest to lowest level of observable inputs, as follows: (1) significant observable inputs, including unadjusted quoted prices for identical assets or liabilities in active markets ("Level 1"), (2) significant other observable inputs, including direct or indirect market data for similar assets or liabilities in active markets or identical assets or liabilities in less active markets ("Level 2") and (3) significant unobservable inputs, including those that require considerable judgment for which there is little or no market data ("Level 3"). When a valuation requires multiple input levels, we categorize the entire fair value measurement according to the lowest level of input that is significant to the measurement even though we may have also utilized significant inputs that are more readily observable.

> *            *            *

> At December 31, 2023, the aggregate carrying amount of our property and equipment represented approximately 84 percent of our total assets.

\*            \*            \*

**Impairments**—In the years ended December 31, 2023 and 2021, we recognized a loss of $5 million and $37 million, respectively, which had no tax effect, recorded in other, net, associated with the impairment of certain equity investments upon determination that the carrying amount exceeded the estimated fair value and that the impairment was other than temporary. ***For the impairment in the year ended December 31, 2021, we estimated the fair value of our investment by applying the income method using significant unobservable inputs, representative of Level 3 fair value measurements, including an assumed discount rate of 12 percent and assumptions about the future performance of the investment, such as future demand and supply for harsh environment floaters, rig utilization, revenue efficiency and dayrates.***

22.    The 2023 10-K purported to warn of risks to the Company, and specifically stated that, "[i]n the third quarter of 2023" the "***Development Driller III concluded the activities contemplated in its drilling contract prior to the end of the contract's firm term that was previously expected early in the fourth quarter of 2023***" and went on to warn only that the "termination payment associated with the drilling contract would not fully compensate us for the early termination of the contract." Specifically, the 2023 10-K stated, in relevant part:

**Our drilling contracts may be terminated due to a number of events, and, during depressed market conditions, our customers may seek to repudiate or renegotiate their contracts.**

Certain of our drilling contracts with customers may be cancelable at the option of the customer upon payment of an early termination payment. ***In the third quarter of 2023, as the most recent example, Development Driller III concluded the activities contemplated in its drilling contract prior to the end of the contract's firm term that was previously expected early in the fourth quarter of 2023.*** The termination payment associated with the drilling contract would not fully compensate us for the early termination of the contract. Drilling contracts also customarily provide for either automatic termination or termination at the option of the customer, typically without the payment of any termination fee, under various circumstances such as non-performance, as a result of significant downtime or impaired performance caused by equipment or operational issues, or sustained periods of downtime due to force majeure events, many of which are beyond our control.

23.    On April 17, 2024, the Company issued a report entitled "Transocean Fleet Status Report," which included drilling rig status and contract information. The report listed the

*Discoverer Inspiration* and the *Development Driller III* as "Idle." The report further defined "Idle"

as "between contracts, readily available for operations." Specifically, the report stated, in relevant

part:

> ***An "Idle" rig is primarily between contracts, readily available for operations, and operating costs are typically at or near normal levels.*** A "Stacked" rig, on the other hand, is primarily manned by a reduced crew or unmanned and typically has reduced operating costs and is (i) preparing for an extended period of inactivity, (ii) expected to continue to be inactive for an extended period, or (iii) completing a period of extended inactivity. However, stacked rigs will continue to incur operating costs at or above normal operating costs for approximately 30 days following initiation of stacking.

24.     On April 29, 2024, the Company announced its first quarter 2024 financial results

in a press release for the period ended March 31, 2024. The press release reported the Company's

first quarter 2024 adjusted net loss of $22 million. The press release quoted Defendant Thigpen as

touting the Company's **strong** "**demand outlook**" with "**numerous long-term contracts awarded**

**over the next several months.**" The press release reported the purported value of the Company's

assets, stating as follows in relevant part:

| | March 31, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 446 | $ 762 |
| Accounts receivable, net of allowance of $2 at March 31, 2024 and December 31, 2023 | 585 | 512 |
| Materials and supplies, net of allowance of $202 and $198 at March 31, 2024 and December 31, 2023, respectively | 437 | 426 |
| Restricted cash and cash equivalents | 270 | 233 |
| Other current assets | 133 | 193 |
| Total current assets | 1,871 | 2,126 |
| | | |
| Property and equipment | 23,948 | 23,875 |
| Less accumulated depreciation | (7,093) | (6,934) |
| Property and equipment, net | 16,855 | 16,941 |
| Contract intangible assets | — | 4 |
| Deferred tax assets, net | 45 | 44 |
| Other assets | 1,166 | 1,139 |
| Total assets | $ 19,937 | $ 20,254 |

25.     On April 30, 2024, the Company submitted its quarterly report for the period ended

March 31, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial

results. The quarterly report touted the Company's strong market position, specifically citing high returns in projects "in deepwater and harsh environments" with projected "increased demand" to be "sustained in the coming years" especially for "offshore drilling rigs capable of operating in these markets." The quarterly report further stated the following regarding the Company's purported fair value measurements and the valuation of the Company's property and equipment, stating in relevant part:

> **Fair value measurements—*We estimate fair value at an exchange price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants.*** Our valuation techniques require inputs that we categorize using a three-level hierarchy, from highest to lowest level of observable inputs, as follows: (1) significant observable inputs, including unadjusted quoted prices for identical assets or liabilities in active markets ("Level 1"), (2) significant other observable inputs, including direct or indirect market data for similar assets or liabilities in active markets or identical assets or liabilities in less active markets ("Level 2") and (3) significant unobservable inputs, including those that require considerable judgment for which there is little or no market data ("Level 3"). When a valuation requires multiple input levels, we categorize the entire fair value measurement according to the lowest level of input that is significant to the measurement even though we may have also utilized significant inputs that are more readily observable.

> \*                    \*                    \*

> Our customers continue to pursue offshore projects in ***deepwater and harsh environments where rates of return and production volumes are anticipated to be very attractive,*** which is reflected in the resumption of postponed projects, commencement of new drilling and exploration campaigns and extensions of current drilling campaigns. ***Offshore drilling activity remains robust in every major ultra-deepwater geographic sector.***

> \*                    \*                    \*

> ***As we project that this increased demand for both our asset groups will be sustained in the coming years,*** and as there are now fewer high-specification ***offshore drilling rigs capable of operating in these markets,*** we believe this demand may prompt the reactivation of cold stacked rigs and the delivery of remaining stranded newbuild assets.

26.    On July 31, 2024, the Company announced its second quarter 2024 financial results in a press release for the period ended June 30, 2024. The press release reported the Company's second quarter 2023 adjusted net loss of  $123 million. The press release quoted Defendant Thigpen touting the Company's strong quarterly performance, that the "entire Transocean team executed well in the second quarter" which "rove revenue efficiency to 97%" and saw the Company "secure[] a number of meaningful contracts, which are illustrative of current industry dynamics and reinforce our view that we are in an increasingly tightening market." The press release reported the purported value of the Company's assets, stating as follows in relevant part:

27.    The press release touted the Company's strong financial results and further reported the Company's assets including $20.3 billion in total assets. Specifically, the press release stated in relevant part:

| | June 30, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 475 | $ 762 |
| Accounts receivable, net of allowance of $2 at June 30, 2024 and December 31, 2023 | 607 | 512 |
| Materials and supplies, net of allowance of $197 and $198 at June 30, 2024 and December 31, 2023, respectively | 440 | 426 |
| Restricted cash and cash equivalents | 400 | 233 |
| Other current assets | 213 | 193 |
| Total current assets | 2,135 | 2,126 |
| | | |
| Property and equipment | 24,066 | 23,875 |
| Less accumulated depreciation | (6,983) | (6,934) |
| Property and equipment, net | 17,083 | 16,941 |
| Contract intangible assets | — | 4 |
| Deferred tax assets, net | 30 | 44 |
| Other assets | 1,077 | 1,139 |
| Total assets | $ 20,325 | $ 20,254 |

28.    On August 1, 2024, the Company submitted its quarterly report for the period ended June 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report touted the Company's strong market position, specifically citing high returns in projects "in deepwater and harsh environments" with projected "increased demand" to be "sustained in the coming years" especially for "offshore drilling rigs capable of operating in

these markets." The quarterly report further stated the following regarding the Company's purported fair value measurements and the valuation of the Company's property and equipment, stating in relevant part:

> **Fair value measurements—*We estimate fair value at an exchange price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants.*** Our valuation techniques require inputs that we categorize using a three-level hierarchy, from highest to lowest level of observable inputs, as follows: (1) significant observable inputs, including unadjusted quoted prices for identical assets or liabilities in active markets ("Level 1"), (2) significant other observable inputs, including direct or indirect market data for similar assets or liabilities in active markets or identical assets or liabilities in less active markets ("Level 2") and (3) significant unobservable inputs, including those that require considerable judgment for which there is little or no market data ("Level 3"). When a valuation requires multiple input levels, we categorize the entire fair value measurement according to the lowest level of input that is significant to the measurement even though we may have also utilized significant inputs that are more readily observable.

> *          *          *

> Our customers continue to pursue offshore projects in ***deepwater and harsh environments where rates of return and production volumes are anticipated to be very attractive,*** which is reflected in the resumption of postponed projects, commencement of new drilling and exploration campaigns and extensions of current drilling campaigns. ***Offshore drilling activity remains robust in every major ultra-deepwater geographic sector.***

> *          *          *

> ***As we project that this increased demand for both our asset groups will be sustained in the coming years,*** and as there are now fewer high-specification ***offshore drilling rigs capable of operating in these markets,*** we believe this demand may prompt the reactivation of cold stacked rigs and the delivery of remaining stranded newbuild assets

29.    On August 1, 2024, the Company held an earnings call in conjunction with the Company's second quarter 2024 financial results. During the earnings call, the Company's CEO, Defendant Thigpen, was asked by analyst Eddie Kim of Barclays on the outlook of the *Development Driller III* and the *Inspiration* specifically. In response, Defendant Thigpen assured

investors that the *Development Driller III* and the *Inspiration* were strategic assets, and the Company was merely keeping them idle in anticipation of a longer-duration contract opportunity. Specifically, during the earnings call, Defendant Thigpen stated, in relevant part:

> **I think, as we said before, we're basically going to only put them** [the *Development Driller III* and the *Inspiration*] **on the right opportunities, but we're not going to try and compete with them for short-term mark.** ***So we're basically keeping them drive for longer opportunities***.

30.     The above statements identified in ¶¶ 18-29 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose to investors: (1) the *Discoverer Inspiration* and the *Development Driller III* were considered non-strategic assets; (2) the Company's recorded asset valuations were overstated; (3) as a result, the Company would take nearly twice the vessels' sale price in impairment if sold;  and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## **Disclosures at the End of the Class Period**

31.     On September 3, 2024, before the market opened, Transocean issued a press release which announced "as part of the Company's effort to dispose of ***non-strategic assets***" it had agreed to sell the *Development Driller III* and the *Discoverer Inspiration* and associated assets for an ***aggregate $342 million***. The Company further announced that the sales would result in an estimated third-quarter non-cash charge of ***up to $645 million associated with the impairment of said assets.***  Specifically, the press release stated, in relevant part:

> On September 3, 2024, as part of our ongoing efforts to dispose of non-strategic assets, Transocean Ltd. (the "Company") announced that a subsidiary of the Company entered into agreements (the "agreements") with a third party to sell the Development Driller III and associated assets for $195 million and the Discoverer Inspiration and associated assets for $147 million. The Company expects the sale of these assets, for an aggregate $342 million, will result in an estimated non-cash

charge for the third quarter 2024 ranging between $630 million and $645 million associated with the impairment of such assets.

The transactions contemplated by the agreements are subject to customary closing conditions and are expected to close in the third quarter of 2024. The Company intends to use substantially all of the proceeds from these transactions to repay existing indebtedness.

32.     On this news, the Company's share price fell $0.42, or 8.86%, to close at $4.32 per share on September 3, 2024, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Transocean securities between October 31, 2023 and September 2, 2024, inclusive , and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

34.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Transocean's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Transocean shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Transocean or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

35.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

36.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

37.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Transocean; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

38.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

39.    The market for Transocean's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Transocean's securities traded at artificially inflated prices during the Class Period.

Plaintiff and other members of the Class purchased or otherwise acquired Transocean's securities relying upon the integrity of the market price of the Company's securities and market information relating to Transocean, and have been damaged thereby.

40.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Transocean's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Transocean's business, operations, and prospects as alleged herein.

41.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Transocean's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

42.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

43.     During the Class Period, Plaintiff and the Class purchased Transocean's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

44.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Transocean, their control over, and/or receipt and/or modification of Transocean's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Transocean, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

45.     The market for Transocean's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Transocean's securities traded at artificially inflated prices during the Class Period. On November 2, 2023, the Company's share price closed at a Class Period high of $6.89 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities

relying upon the integrity of the market price of Transocean's securities and market information relating to Transocean, and have been damaged thereby.

46.     During the Class Period, the artificial inflation of Transocean's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Transocean's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Transocean and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

47.     At all relevant times, the market for Transocean's securities was an efficient market for the following reasons, among others:

(a)     Transocean shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Transocean filed periodic public reports with the SEC and/or the NYSE;

(c)     Transocean regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Transocean was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

48.    As a result of the foregoing, the market for Transocean's securities promptly digested current information regarding Transocean from all publicly available sources and reflected such information in Transocean's share price. Under these circumstances, all purchasers of Transocean's securities during the Class Period suffered similar injury through their purchase of Transocean's securities at artificially inflated prices and a presumption of reliance applies.

49.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **NO SAFE HARBOR**

50.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Transocean who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

51.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

52.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Transocean's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

53.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Transocean's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

54.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Transocean's financial well-being and prospects, as specified herein.

55.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Transocean's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Transocean and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

56.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or

reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

57. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Transocean's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

58. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Transocean's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that

was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Transocean's securities during the Class Period at artificially high prices and were damaged thereby.

59.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Transocean was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Transocean securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

60.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

62.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.    Individual Defendants acted as controlling persons of Transocean within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the

Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

64.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

65.    As set forth above, Transocean and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  December 26, 2024

/s/   *Rebecca Dawson*

**GLANCY PRONGAY & MURRAY LLP**
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email: rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Eitan Kimelman
New York, NY
60 East 42nd Street, 46th Floor,
New York, New York 10165
Telephone: (212) 697-6484

*Counsel for Plaintiff Mátay Gábor*

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.      I, Gabor Matay, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Transocean Ltd. ("Transocean") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Transocean securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Transocean securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Transocean securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** <u>december 9, 2024</u>
                **(Date)**

Signed by:

<u>41BE476D33C7432</u>
                **(Signature)**

<u>**Gabor Matav**</u>
                **(Type or Print Name)**

**Gabor Matay's Transactions in Transocean Ltd. (RIG)**

**Account 1**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 11/13/2023 | Bought | 10,000 | $6.5895 |
| 11/22/2023 | Bought | 100 | $6.1800 |
| 11/22/2023 | Bought | 100 | $6.1800 |
| 11/22/2023 | Bought | 925 | $6.1800 |
| 11/22/2023 | Bought | 200 | $6.1800 |
| 11/22/2023 | Bought | 520 | $6.1800 |
| 11/22/2023 | Bought | 200 | $6.1800 |
| 11/22/2023 | Bought | 80 | $6.1800 |
| 11/22/2023 | Bought | 100 | $6.1800 |
| 11/22/2023 | Bought | 2,210 | $6.1999 |
| 12/29/2023 | Sold | -1,180 | $6.3705 |

**Account 2**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 3/6/2024 | Bought | 5,400 | $5.1800 |
| 3/21/2024 | Sold | -608 | $6.0817 |