**UNITED STATES DISTRICT COURT**
<u>**SOUTHERN DISTRICT OF NEW YORK**</u>

In re TRANSOCEAN LTD SECURITIES
LITIGATION

Case No. 1:24-cv-09964 (AT)

**AMENDED COMPLAINT FOR
VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

**CLASS ACTION**

<u>Demand for Jury Trial</u>

 Lead Plaintiff John Mahoney ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the

federal securities laws the following based upon knowledge with respect to his own acts, and upon

facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a)

review and analysis of relevant filings made by Transocean Ltd. ("Transocean") with the United

States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Transocean's

public documents, conference calls, press releases, and stock chart; (c) review and analysis of

securities analysts' reports and advisories concerning Transocean; and (d) information obtained

from interviews with former employees and other individuals knowledgeable about Transocean.

 Plaintiff believes that further substantial evidentiary support will exist for the allegations

set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the

allegations contained herein are known only to the defendants or are exclusively within their

control.

<u>**NATURE OF THE ACTION**</u>

 1. This is a federal securities class action on behalf of all investors who

purchased or otherwise acquired Transocean securities between May 1, 2023 and September

2, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Transocean's operations, specifically the value and availability of certain Transocean assets. Defendants' statements included, among other things, statements that its vessels the *Discoverer Inspiration* and the *Development Driller III* were idle but readily available for operations and failing to record any impairment to the recorded asset values for these vessels in Transocean's financial statements.

3.      Defendants provided these positive statements to investors while, at the same time, disseminating false and materially misleading statements and/or concealing material adverse facts concerning the true state of Transocean's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: the *Discoverer Inspiration* and the *Development Driller III* were considered non-strategic assets, that each vessel was in such a poor condition that she was not expected to obtain a new contract from any Transocean customer, and, accordingly, their recorded asset valuations were overstated. As a result of the foregoing, Defendants' positive statements about Transocean's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

4.      Investors began to question the veracity of Defendants' public statements on September 3, 2024 when Transocean announced, while the market was closed, "as part of the Company's effort to dispose of non-strategic assets" it had agreed to sell the *Development Driller III* and the *Discoverer Inspiration* and associated other assets for an aggregate $342 million. Transocean further announced that the sales would result in an estimated third-quarter non-cash charge of up to $645 million associated with the impairment of said assets.

Therefore, the expected proceeds from the sale of the two aforementioned vessels was less than half the value that Transocean had previously recorded as reflecting the fair market value of the vessels.

5.     Investors and analysts reacted immediately to Transocean's revelation. The price of Transocean's common stock declined dramatically. From a closing market price of $4.74 per share on August 30, 2024, Transocean's stock price fell to $4.32 per share on September 3, 2024, a decline of over 8%.

6.     This action seeks to recover the losses investors sustained as a result of Defendants' violations of the federal securities laws.

## JURISDICTION AND VENUE

7.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Transocean's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone

communications and the facilities of the national securities exchange.

## THE PARTIES

12.     Plaintiff purchased Transocean common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Transocean has been previously submitted to the Court (ECF No. 15-1).

13.     Transocean, Ltd. is Swiss corporation with its principal executive offices located Turmstrasse 30, Steinhausen, Switzerland. During the Class Period, Transocean's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "RIG."

14.     Defendant Jeremy D. Thigpen ("Thigpen") was, at all relevant times, Transocean's Chief Executive Officer.

15.     Defendant Mark L. Mey ("Mey") was Transocean's Chief Financial Officer from May 2015 until May 20, 2024.

16.     Defendant Thad Vayda ("Vayda") was Tranocean's Chief Financial Officer from May 20, 2024 onwards.

17.     Defendants Thigpen, Mey, and Vayda are sometimes referred to herein as the "Individual Defendants." Transocean together with the Individual Defendants are referred to herein as the "Defendants."

18.     The Individual Defendants, because of their positions with Transocean, possessed the power and authority to control the contents of Transocean's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies

of Transocean's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19.    Transocean is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

20.    The scienter of the Individual Defendants, and other employees and agents of Transocean are similarly imputed to it under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

21.    Transocean, together with its subsidiaries, provides offshore contract drilling services for oil and gas wells worldwide. Transocean currently owns or operates a fleet of 34 mobile offshore drilling units, consisting of 26 ultra-deepwater floating rigs and eight harsh environment floating rigs. Transocoean's rigs are categorized as under contract, "idle," or "stacked."

22.    *Discoverer Inspiration* is a drillship that entered service in 2010. Drillships are

floating vessels that are shaped like conventional ships, generally self-propelled and considered to be the most mobile of the major rig types. Drillships typically have greater deck load and storage capacity than semi-submersible rigs, which provides logistical and resupply efficiency benefits for customers. Drillships are generally better suited to operations in calmer sea conditions and typically do not operate in areas considered to be harsh environments.

23.    Upon concluding a contract for Hess Corporation in April 2023, *Discoverer Inspiration* was recorded as "idle" on Transocean's Fleet Status Reports and in its SEC Filings.

24.    During the first quarter of 2024, *Discoverer Inspiration* was towed to Las Palmas in the Canary Islands.

25.    *Development Driller III* is a semi-submersible that entered service in 2009. Semi-submersibles are a specialized type of vessel that can float in a partially submerged state, with its main hull below the waterline and the deck above the waterline. Semi-submersibles are able to maintain their stability in harsh environments and can operate in ultra deep water.

26.    *Development Driller III* was under contract with TotalEnergies until August of 2023, when it was recorded as "Idle" on Transocean's Fleet Status Reports and in its SEC Filings.

27.    In August 2023, *Development Driller III* was positioned in Aruba.

28.    As described by Transocean in its Annual Reports for the years ended 2022 and 2023, filed with the SEC on Form 10-K, "an *idle* rig is between drilling contracts, readily available for operations, and operating costs are typically at or near normal operating levels."

In contrast, a "stacked rig, typically has reduced operating and maintenance costs, is staffed by a reduced crew or has no crew and is (a) preparing for an extended period of inactivity, (b) expected to continue to be inactive for an extended period, or (c) completing a period of extended inactivity." Transocean provides periodic fleet updates as to the status of its vessels. As of October 18, 2023, Transocean had 13 stacked or idle rigs. Of those 13, two were marked idle: the *Discoverer Inspiration* (as of April 2023) and the *Development Driller III* (as of August 2023).

29.    Transocean describes its accounting policy regarding impairment of its long-lived assets such as the *Discoverer Inspiration* and the *Development Driller III*, as follows:

> **Long-lived asset impairment**—We review the carrying amounts of long-lived assets, including property and equipment and right-of-use assets, for potential impairment when events occur or circumstances change that indicate that the carrying amount of such assets may not be recoverable. For assets classified as held and used, we determine recoverability by evaluating the estimated undiscounted future net cash flows based on projected dayrates and utilization of the asset group under review. We consider our asset groups to be ultra-deepwater floaters and harsh environment floaters. When an impairment of one or more of our asset groups is indicated, we measure an impairment as the amount by which the carrying amount of the asset group exceeds its estimated fair value. We measure the fair values of our asset groups by applying a variety of valuation methods, incorporating a combination of income, market and cost approaches, using projected discounted cash flows and estimates of the exchange price that would be received for the assets in the principal or most advantageous market for the assets in an orderly transaction between market participants as of the measurement date. For an asset classified as held for sale, we consider the asset to be impaired to the extent its carrying amount exceeds its estimated fair value less cost to sell.

30.    Thus, under Transocean's accounting policy, the value of any individual vessel, including whether or not it is impaired, is disclosed only once it is re-categorized from "held and used" to "held for sale". Transocean, therefore, is able to avoid recording an impairment to a vessel simply by continuing to categorize her as "held and used" even if that

vessel's fair value is materially less than her recorded value and where there is no expectation that she will generate income in the foreseeable future.

### *Former Employees Confirm Transocean Vessels Were Non-Operational and a "Rust Bucket".*

31.     FE1 worked in the project sector of Transocean's accounting department from April to October 2024. FE1 was Transocean's connection between the accounting department and project managers and ensured that sufficient funds were budgeted for repair projects on rigs. According to FE1, the Discoverer Inspiration and Development Driller III had no repair projects ongoing during her tenure at Transocean. According to FE1, the accounting team was small, and everyone in the accounting department knew what projects were being worked on. FE1 further stated that every repair project costing at least $5 million had to be approved by the CEO, Defendant Thigpen.

32.     FE2 worked on the *Discoverer Inspiration* from January 2023 to February 2024. FE2 worked on a ship anchored near the *Discoverer Inspiration*, while both were being repaired, in December 2023 – January 2024. According to FE2, by that time she began work on the *Discoverer Inspiration*, she had turned into aa "rust bucket." FE2 remarked that she had heard from those working on it, it was visually apparent that the *Discoverer Inspiration* was in such a poor state that it would not worth it for Transocean to invest money repairing it. FE2 heard from those working on the *Discoverer Inspiration*, and could see that that there were piles of rust everywhere.

33.     FE3 worked as Transocean's Director of Technical Services and Engineering from September 2018 to March 2024. In her role, FE3 was tasked with devising solutions to technical issues, fleet-wide.

34.     FE3 stated that, before the *Discoverer Inspiration* was offered for sale or

divested, the rig was de-manned completely in fall 2023. FE3 continued: "[b]ecause there was a technical decision to be taken, that we tow the rig across the Atlantic, like a dead ship, and pull thrusters in Las Palmas, and offer the rig for scrap."

35.    According to FE3, the decision to divest a rig was such a large decision, that the "CEO…and CFO were definitely involved[.]"

36.    FE3 also stated that the two rigs had been "on and off", rather than having continuous contracts.

37.    According to FE3, the "bid assessment sheet", which shows the expected profit or loss from a bid for work for a given rig would go to the CEO and COO for final assessment before a bid was approved.

38.    In terms of upgrades, FE3 said, "I can't recall seeing many projects on the Inspiration."

39.    According to FE3, throughout the Class Period, each Transocean vessel was given an internal rating based on its condition. This rating was provided to Thigpen and Transocean's Chief Operating Officer. Similarly, Transocean's Senior Vice-President of Marketing maintained a Bid Assessment Sheet which contained details of potential bids for contracts for Transocean vessels. This Bid Assessment Sheet was provided to Thigpen and Transocean's Chief Operating Officer for final assessment.

40.    FE4 worked as a dynamic positioning operator on the *Discoverer Inspiration* from December 2021 to May 2023, joining the crew just after she was re-operationalizing out of a period in warm-stack.

41.    FE4 reported that stacking the *Discoverer Inspiration* presented greater problems than other rigs, as its systems required more work to render it operational. FE4

reported that in March 2023, those aboard the *Discoverer Inspiration* knew its contract would not be renewed, and the rig was most likely going to be stacked. FE4 further reported that re-operationalizing the *Discoverer Inspiration* after a period in warm-stack presented many problems. One such problem was that the computers for the positioning system had to be replaced—pursuant to the component manufacturer's instructions—but to save money, and avoid putting the rig out of service for the time it would take to replace the computers, the crew used scrap from other rigs.

42.    "When I pulled up to the rig, on a small boat…. It looked like a ghost ship," recalled FE4. "It needed to be pulled out and repainted. There was a lot of work, cutting rails – because they just rust. On the Inspiration, it was a daily occurrence that a thruster would crash, and we'd be up all night, working on it." FE4 stated that this continued throughout his full tenure at the company.

43.    FE5 worked as a subsea department employee from 2011 – 2021 on the *Discoverer Inspiration*. FE5 confirmed that the decision to deem a rig non-strategic came from Transocean's executives and named Thigpen and other corporate officers as those who made such decisions.

44.    FE6 worked as a subsea engineering superintendent on the Development Driller III and as a senior subsea engineer on the *Discoverer Inspiration*. FE6's employment with Transocean, and on these two rigs, stretched from 2013 to approximately 2023.

45.    According to FE6, after stacking rigs, Transocean would promise crews—who were laid off after a rig was warm or cold stacked—that it was expected to close a contract that would enable their rehire, but instead, would then sell the rigs for a fraction of their market value.

46.    FE6 stated that Transocean publicly reported the value of assets like the *Discoverer Inspiration* and the *Development Driller III* according to the amount for which a competitor might buy them, but in fact Transocean never intended to sell assets to competitors, instead preferring to sell them for scrap. According to FE6, Transocean sold rigs for a fraction of their market value because "they'd rather sell them to a scrapyard and take a hit than to competitors." FE6 noted that he heard this from management.

47.    FE6 further stated that the decision to scrap an asset would have come from the COO level or above.

48.    According to FE6, in 2015-2016, when the oil markets were in a state of decline, Transocean owned a fleet of approximately 119 rigs that it rapidly reduced to about 50 rigs. FE6 stated that most of these rigs were sold to scrapyards in India.

49.    At that time, engineers supervised by FE6 told him that they had been sent by his superiors onto rigs that had been sold, tasked with removing the rigs' blowout preventors. While onboard, they noted the valuable parts, tools, and equipment still on the rig, which were to be imminently sent to the scrapyard.

50.    FE7 worked for Transocean from May 2012 to September 2023. FE7 worked in various roles on rigs, until he became a member of Transocean's technical support team, and moved from rig to rig, solving various technical problems on the rigs.

51.    As a member of Transocean's technical support team, FE7 visited the *Discoverer Inspiration* three times, in 2018, 2019, and in 2020, staying from 10 to 15 days each time.

52.    FE7 stated that in 2018, when he visited the *Discoverer Inspiration*, it was to remove rust and paint the rig's moonpools, which were rusty. FE7 stated that he was told by

the *Discoverer Inspiration*'s deck supervisor at the time that the instruction to clean the rig came from Defendant Thigpen.

53.     FE7 stated that, at the time, the *Discoverer Inspiration* was operable, but in poor condition. Angle irons were disintegrating, and the moonpool's blowout preventer cart track was so rusty, it was difficult to move. FE7 compared the state of the *Discoverer Inspiration* to a wrecked car, where "the fender is smashed, the hood is smashed, but the car still runs." In other words, FE7 stated, the rig's core components were operable, but the rig was in a state of obvious physical disrepair.

54.     FE7 estimated that if no more paint was applied to the *Discoverer Inspiration* in 2018, the rig's lifespan was, at maximum, 4-5 more years. FE7 explained that painting is a continuous operation, and many rigs had a full-time paint crew. However, at the time FE7 worked on the *Discoverer Inspiration* in 2018, the rig was minimally staffed.

55.     FE7 explained that he worked on other Transocean assets built in 2014, 2015, 2016, and 2018, and stated that with respect to physical condition, the *Discoverer Inspiration* was in the worst condition of any rig he had worked on.

56.     FE7 also worked on the *Discoverer Inspiration* in January 2019 and the condition was worse than when he visited in 2018. Similarly, FE7 stated that when he was sent to the *Discoverer Inspiration* in 2020, it was rusty, run down, and in worse condition than when he visited in 2019.

57.     FE7 stated that with respect to the decision to stack a rig, Paul Johnson, Keith Miller, Jeremy Thigpen, Jeff Richardson, or Ramsey Richardson were those at Transocean who would be involved in such a decision.

58.     FE7 stated that once a rig is cold-stacked it is picked apart for parts.

59.     As executive managers of Transocean, the Individual Defendants monitored and reviewed the status of every Transocean vessel both in terms of her condition as well as contract status.

### The Defendants Materially Misled Investors Concerning
### Transocean's Rig Assets
### *May 1- 2, 2023*

60.     On May 1, 2023, Transocean published its first quarter 2023 financial results in a press release for the period ended March 31, 2023. The press release reported the Company's first quarter 2023 adjusted net loss of $275 million. Defendant Thigpen stated, in relevant part:

> The Transocean team delivered an outstanding quarter of safe, reliable and efficient operations, with an adjusted EBITDA margin of 33% on adjusted revenues of $667 million. The strong performance is the result of excellent revenue efficiency of nearly 98 percent and exemplifies our commitment to operational excellence.
> **Additionally, the contracts we secured during the quarter, which were predominantly for our harsh environment fleet, complement the wave of ultra- deepwater fixtures we announced over the last several quarters, providing further evidence of a broad, sustained upcycle.**

> [Emphasis added].

61.     On May 2, 2023, Transocean filed its quarterly report on Form 10-Q with the SEC reporting its financial and operating results for the quarter ending March 31, 2023 (the "Q1 2023 10-Q). The Q1 2023 10-Q contained misrepresentations about the value of assets held by Transocean, Transocean's fair market measurements, the drilling market and investments in deepwater and harsh environment offshore projects, and the company's disclosures and control procedures.

62.     In the consolidated financial statements filed with the Q1 2023 10-Q, Transocean disclosed that the company had $23.996 billion in property and equipment.

63.     On May 2, 2023, there was a call on which Transocean's executives discussed earnings and results for the first quarter 2023. In response to a question from an analyst regarding prospects for the *Discoverer Inspiration*, Thigpen stated:

> I can't tip my hand to these precise opportunities we're exploring. But yes, ***we're in active dialogue on both the rigs for different things. And we expect that fairly shortly, we'll be able to add some more backlog to those.*** And kind of as a reminder on that contracting philosophy. ***We are purposefully keeping a couple of rigs available in the near term to take advantage of this improving market for us. (…) it's nice to have the majority of the fleet on long-term contracts, but we certainly also want to be able to capture the upside in this improving market*** (emphasis added).

64.     On the same earnings call on May 2, 2023, in response to a question from an analyst regarding future indicators and potential short-term opportunities moving forward for the *Discoverer Inspiration*, Executive VP & Chief Executive Commercial Officer Roddie Mackenzie stated:

> ***[W]e're in discussions and part of tenders on a couple of things for the inspiration.*** But she's an example of one of our lower specification units. So we'll kind of take a measured approach to that. We're not going to jump on anything just yet. ***We're not in a particular hurry to do anything there, but there are a couple of interesting things on the horizon. So stay tuned.*** (emphasis added).

65.     The statements above contained in the Q1 2023 10-Q and conference call were false and/or materially misleading because it concealed and misrepresented the true state of Transocean's assets, specifically Transocean's rig asset classification. In truth, the *Discoverer Inspiration* was in a dilapidated condition and was not expected to earn another contract. Therefore, it was not readily available for operations, was considered a non-strategic asset by Transocean, and its recorded asset valuation was overstated. The overstatement of its value was only revealed in September 2024, when Transocean disclosed that it had sold the

*Discoverer Inspiration* for less than half its recorded value.

<u>*July 19 – August 1, 2023*</u>

66.    In its Fleet Status Report published on July 19, 2023, Transocean had categorized the *Discoverer Inspiration* as "Idle". This meant she was "between drilling contracts, readily available for operations, and operating costs are typically at or near normal operating levels."

67.    The categorization of the *Discoverer Inspiration* as "idle" was false and misleading because she was in such a dilapidated condition that she was not "readily available for operations". Further, Transocean was reducing her crew to minimize costs so that her operating costs were not at or near normal levels and, as it would require significant time and expense to prepare her for any potential contract which would thus not be profitable, it was not expected that she would obtain another contract.

68.    On July 31, 2023, Transocean filed its quarterly report on Form 10-Q with the SEC reporting its financial and operating results for the quarter ending June 30, 2023 (the "Q2 2023 10-Q). The Q2 2023 10-Q contained misrepresentations about the value of assets held by Transocean, Transocean's fair market measurements, the drilling market and investments in deepwater and harsh environment offshore projects, and the company's disclosures and control procedures.

69.    In the consolidated financial statements filed with the Q2 2023 10-Q, Transocean disclosed that the company had $23.527 billion in property and equipment.

70.    The accounting for the *Discoverer Inspiration* reflected its status as "held and used".

71.    On August 1, 2023, Transocean held an earnings call to discuss the second

quarter 2023 financial results. During the call, Mey, discussed the high revenue efficiency of the fleet but noted that *Development Driller III* and *Discoverer Inspiration* were negatively impacting Transocean's revenues during the quarter stating: "[f]or the third quarter of 2023, we expect adjusted contract drilling revenue of approximately $720 million based upon an average fleet-wide revenue efficiency of 96.5%" and that the quarter-over-quarter decrease, in part were the "***low utilization on a development driller 3 and discoverer inspiration.***" (Emphasis added).

72.     The statements above contained in the Fleet Status Report, Q2 2023 10-Q, and conference call were false and/or materially misleading because it concealed and misrepresented the true state of Transocean's assets, specifically Transocean's rig asset classification. In truth, the *Discoverer Inspiration* was in a dilapidated condition and was not expected to earn another contract. Therefore, it was not readily available for operations, was considered a non-strategic asset by Transocean, and its recorded asset valuation was overstated. Similarly, the *Development Driller III* was not considered a strategic asset and its recorded asset valuation was overstated as well. The overstatement of their value was only revealed in September 2024, when Transocean disclosed that it had sold them for less than half their recorded value.

*October 18-31, 2023*

73.     In its Fleet Status Report published on October 18, 2023, Transocean categorized the *Discoverer Inspiration* and *Devlopment Driller III* as "Idle". This meant they were "between drilling contracts, readily available for operations, and operating costs are typically at or near normal operating levels."

74.     On October 31, 2023, Transocean published its third quarter 2023 financial

results in a press release for the period ended September 30, 2023. The press release reported

Transocean's third quarter 2023 adjusted net loss of $280 million. Thigpen stated, in pertinent

part:

> For the sixth consecutive quarter Transocean increased its backlog, ending the third quarter at $9.4 billion dollars. Not only is the size of our backlog industry-leading, but it also contains many of the industry's highest dayrate fixtures. In particular, we are pleased to have secured a three-year contract for *Deepwater Aquila* in Brazil, as it facilitated the acquisition of the outstanding interest in Liquila Ventures Ltd. The addition of the *Aquila* further reinforces Transocean's leadership position in the high-specification, ultra-deepwater drilling market, as she is our eighth 1400 short ton, dual activity, seventh generation drillship, of which, there are only 12 in the global competitive fleet.
>
> ***Based on our ongoing conversations with customers, we firmly believe that we remain in the early stages of a multi-year upcycle. With our fleet of the most capable high-specification ultra-deepwater drillships and harsh environment semisubmersibles, Transocean is uniquely positioned to capitalize on current and future opportunities.***
>
> [Emphasis added].

75.    Also on October 31, 2023, Transocean submitted its quarterly report for the

fiscal period ended September 30, 2023 on a Form 10-Q filed with the SEC, affirming the

previously reported financial results.

76.    In the consolidated financial statements filed with the Q3 2023 10-Q,

Transocean disclosed that the company had $23.674 billion in property and equipment. The

accounting for the *Discoverer Inspiration* reflected its status as "held and used".

77.    On October 31, 2023, there was a call on which Transocean executives

discussed earnings and results for the third quarter 2023. In response to a question from an

analyst regarding available rigs or open revenue days in 2024 considering that Transocean had

around 8 rigs and some were idle, Mey stated:

We sit down and we look at the rigs, we look at the opportunities, we look at the probability obviously. And then we assume a day rate based upon our 5-year planned day rate deck. And in some cases, we will put that rig to work using that day rate deck. Other times we will assume that the rig sits idle for a little while, or a long while depending on where it is and what type of rig it is. So there is an element, approximately 10% in that, which is spec revenue, and we update that as we go through the quarters next year.

78.     In the same earnings call on October 31, 2023, in response to a question from an analyst about the dynamics of trading some term for rate in the context of Transocean management's efforts to maximize returns and cash flows, Thigpen stated:

[T]here are other rigs, we want to keep that rig and kind of test the market on short-term or continue to push day rates as much as we possibly can. Now the risk in that is you get some idle time every now and then, you get some white space, as we do right now with the Invictus. But that is the rig that we have continually used to push rates and got us to where we are today. So with some of our rigs, we will continue to take that strategy.

79.     In response to the same question, Mey added:

I'm kind of a little bit counter to previous cycles where all the best rigs got fixed first at the lowest day rate. We've been quite purposeful in trying to keep a couple of them available so that later in the cycle the operators can still get their hands on high-specification top spec rigs. And of course, that might come with a little extra cash.

80.     The statements above contained in the Fleet Status Report, Q3 2023 10-Q and conference call were false and/or materially misleading because it concealed and misrepresented the true state of Transocean's assets, specifically Transocean's rig asset classification. In truth, the *Discoverer Inspiration* was in a dilapidated condition and was not expected to earn another contract. Therefore, it was not readily available for operations, was considered a non-strategic asset by Transocean, and its recorded asset valuation was

overstated. Similarly, the *Development Driller III* was not considered a strategic asset and its recorded asset valuation was overstated as well. The overstatement of their value was only revealed in September 2024, when Transocean disclosed that it had sold them for less than half their recorded value.

*February 20-21, 2024*

81.    On February 20, 2024, Transocean published a press release detailing its fourth quarter and full year 2023 fiscal results for the year ended December 31, 2024. The press release stated, in relevant part:

| | December 31, | |
| | 2023 | 2022 |
| --- | --- | --- |
| **Assets** | | |
| Cash and cash equivalents | $ 762 | $ 683 |
| Accounts receivable, net | 512 | 485 |
| Materials and supplies, net | 426 | 388 |
| Restricted cash and cash equivalents | 233 | 308 |
| Other current assets | 193 | 144 |
| Total current assets | 2,126 | 2,008 |
| | | |
| Property and equipment | 23,875 | 24,217 |
| Less accumulated depreciation | (6,934) | (6,748) |
| Property and equipment, net | 16,941 | 17,469 |
| Contract intangible assets | 4 | 56 |
| Deferred tax assets, net | 44 | 13 |
| Other assets | 1,139 | 890 |
| Total assets | $20,254 | $20,436 |

The accounting for the *Discoverer Inspiration* and *Development Driller III* reflected their status as "held and used".

82.    On February 20, 2024, there was a call on which Transocean executives discussed earnings and results for the fourth quarter and full year 2023. In his opening remarks, President & COO Keelan I. Adamson stated:

> **We also completed contract preparation projects and subsequently mobilized 6 rigs. The development driller 3**, Duravit Deepwater KG2, the Deepwater Orion, Transocean

Barents, Transocean Endurance and the Transocean Equinox **to new programs in different regions with different customers around the world**. (…)

From an asset perspective, we continue to proactively manage the composition of our fleet with a strategic focus on owning and operating high-specification, ultra-deepwater and harsh environment floaters. (Emphasis added).

83.    In the same earnings call on February 20, 2024, in response to a question from an analyst referring to Transocean's prior remarks indicating that even in case market rates do not improve Transocean was in position to reducing its debt in approximately $3 billion in a span of two years assuming no changes in market dynamics, Thigpen stated:

I think just to add to that, I think something that gets overlooked. **You heard Keelan's remarks and the number of rigs that we took delivery of are relocated and the amount of investment we had to put. Now these rigs are on longer-term contracts.** And so the costs associated with them are just going to be daily operating costs, which is certainly more than covered by the day rate and we're putting ourselves in a very, very good position. And as we also said on the prepared remarks, **most of the negotiations that are taking place right now are for longer-term contracts. And so that's where you can really start to get that flow through and start to generate a lot of cash**. (Emphases added).

84.    In the same earnings call on February 20, 2024, in response to a question from an analyst about the future, both near and long term, for the *Discoverer Inspiration* and *Development Driller III* considering some idle time on those rigs and the trade-off between higher day rates and utilization, Thigpen stated:

**[O]n [these] rigs, we've got them bid into several different things.** We -- it just so happens that **the inspiration and the DD3 are amongst our lower specification sixth-generation assets. So we continue to look at all that stuff. There are several opportunities for it.** So again, I can't really give you the details of the things that we're working on, but we think there's some good things coming that way. And even if there is some additional idle time on those

rigs. We've been very disciplined about that. We're certainly not going to go and chase something for the sake of it. And if we needed to, we would even take them off the market. (Emphasis added).

85.    On February 21, 2024, Transocean submitted its annual report for the fiscal year ended December 31, 2023 on a Form 10-K filed with the SEC, affirming the previously reported financial results (the "2023 10-K"). The 2023 10-K stated in relevant part:

> **Our drilling contracts may be terminated due to a number of events, and, during depressed market conditions, our customers may seek to repudiate or renegotiate their contracts.**
>
> Certain of our drilling contracts with customers may be cancelable at the option of the customer upon payment of an early termination payment. *In the third quarter of 2023, as the most recent example, Development Driller III concluded the activities contemplated in its drilling contract prior to the end of the contract's firm term that was previously expected early in the fourth quarter of 2023.* The termination payment associated with the drilling contract would not fully compensate us for the early termination of the contract. Drilling contracts also customarily provide for either automatic termination or termination at the option of the customer, typically without the payment of any termination fee, under various circumstances such as non-performance, as a result of significant downtime or impaired performance caused by equipment or operational issues, or sustained periods of downtime due to force majeure events, many of which are beyond our control.

86.    In its Fleet Status Report contained in the 2023 10-K, Transocean categorized the *Discoverer Inspiration* and *Devlopment Driller III* as "Idle". This meant they were "between drilling contracts, readily available for operations, and operating costs are typically at or near normal operating levels."

87.    The statements above contained in the 2023 10-K and conference call were false and/or materially misleading because it concealed and misrepresented the true state of Transocean's assets, specifically Transocean's rig asset classification. In truth, the *Discoverer*

*Inspiration* was in a dilapidated condition and was not expected to earn another contract. Therefore, it was not readily available for operations, was considered a non-strategic asset by Transocean, and its recorded asset valuation was overstated. Similarly, the *Development Driller III* was not considered a strategic asset and its recorded asset valuation was overstated as well. Transocean's financial projections for 2024 did not include any revenue for either of these vessels. The overstatement of their value was only revealed in September 2024, when Transocean disclosed that it had sold them for less than half their recorded value.

<u>*April 17-30, 2024*</u>

88.     On April 17, 2024, Transocean published a report entitled "Transocean Fleet Status Report," which included information about drilling rig status and contracts. The report listed the *Discoverer Inspiration* and the *Development Driller III* as "Idle." This meant they were "between drilling contracts, readily available for operations, and operating costs are typically at or near normal operating levels."

89.     On April 29, 2024, after the market closed, Transocean published its first quarter 2024 financial results in a press release for the period ended March 31, 2024. The press release reported the Company's first quarter 2024 adjusted net loss of $22 million. Defendant Thigpen stated, in relevant part:

> Over the first months of 2024, Transocean has achieved some fairly significant milestones. First, we secured a 365-day extension on Deepwater Asgard at a rate of $505,000 per day, once again demonstrating the sustained tightness in the high- specification floater market as well as Transocean's ability to command industry-leading dayrates. Additionally, earlier this month we finalized a $1.8 billion debt refinancing transaction, enabling us to improve near-term liquidity and start the process of simplifying our balance sheet. We also completed the extension of our revolving credit facility to mid-2028, further enhancing our financial flexibility.
>
> Looking ahead, we remain encouraged by the demand outlook and

expect to see numerous long-term contracts awarded over the next several months. As we work to secure those contracts, we will remain acutely focused on operational execution across our fleet, as we endeavor to maximize the conversion of our industry-leading backlog to cash.

90.    The press release also reported Transocean's purported assets for the quarter, in pertinent part:

| Assets | March 31, 2024 | December 31, 2023 |
|---|---|---|
| Cash and cash equivalents | $ 446 | $ 762 |
| Accounts receivable, net of allowance of $2 at March 31, 2024 and December 31, 2023 | 585 | 512 |
| Materials and supplies, net of allowance of $202 and $198 at March 31, 2024 and December 31, 2023, respectively | 437 | 426 |
| Restricted cash and cash equivalents | 270 | 233 |
| Other current assets | 133 | 193 |
| Total current assets | 1,871 | 2,126 |
| Property and equipment | 23,948 | 23,875 |
| Less accumulated depreciation | (7,093) | (6,934) |
| Property and equipment, net | 16,855 | 16,941 |
| Contract intangible assets | — | 4 |
| Deferred tax assets, net | 45 | 44 |
| Other assets | 1,166 | 1,139 |
| Total assets | $ 19,937 | $ 20,254 |

91.    On April 30, 2024, Transocean published its quarterly report for the period ended March 31, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results.

92.    In the consolidated financial statements filed with the Q1 2024 10-Q, Transocean disclosed that the company had $23.948 billion in property and equipment. The accounting for the *Discoverer Inspiration* and *Development Driller III* reflected their status as "held and used".

93.    On April 30, 2024, there was a call on which Transocean executives discussed earnings and results for the first quarter 2024. In response to a question from an analyst about the overall market outlook taking into consideration Transocean's contract durations extending and the steady, though slow, increase in daily rates, particularly the prospects for

Transocean's idle rigs between now and 2030, Executive VP & Chief Commercial Officer

Roddie Mackenzie stated:

> Yes, that's a really interesting question. As we go through what's happening around the world, we can say for the first time that every region that we're currently active in is going to have a call on rigs. So we're looking at, I think, actually bar not in every single region for rigs than they have to date. So at the moment, what's happening is there's a run on the active fleet. So basically, as the guys had alluded to in the prepared comments, there's a significant number of direct negotiations outside of tenders that are essentially trying to secure the rigs that are already active. So I think from that point of view, ***my view is that 2024 is going to see pretty much the entire active fleet sold out for 2 to 3 years going forward. And as we get towards the end of '24, that's when the call on the stacked fleet is going to happen. And of course, we've reiterated this many times that while there are active rigs available, we will not be [Audio Gap] rigs into that mix. We'll bide our time and wait until the economics are right for that.*** Certainly, there's no rush to do it at the moment. But ***I think we've got a pretty good shot at putting several of those rigs back to work, certainly before the end of the decade.*** (Emphases added).

94.    In the same earnings call on April 30, 2024, in response to another question

from an analyst related to Transocean's idle rigs, the Discoverer Inspiration and the

Development Driller III, President & COO Keelan I. Adamson stated:

> ***The Inspiration essentially is repositioned into the Las Palmas area. She's not stacked, she's idle. We're obviously pitting her into plenty of opportunities***, particularly in the Africa and Asia regions. ***The DD3 is idle in Aruba and waiting for its next opportunity***. But I'll let Roddie maybe add some color to the other opportunities.

95.    In response to the same question, Executive VP & Chief Commercial Officer

Roddie Mackenzie added:

> So ***we do have several things there, but we're looking to make sure that we get the right opportunity to put the rigs to work long term***

> ***rather than moving them to short term to work.*** So at the moment,
> we're quite comfortable keeping them where they are until they get
> the right opportunity. (Emphases added)

96.     In the same earnings call on April 30, 2024, in response to another question

from an analyst about Transocean's approach to the market regarding its seventh and sixth

generations rigs inquiring specifically how rates are bid and whether they are different

depending on the rig's generation, or if it is all about having one rig at the right place at the

right time, and if this approach would result in good rates for sixth generations rigs in the

future, Executive VP & Chief Commercial Officer Roddie Mackenzie stated:

> Yes. So I think you see -- ***so several of our 6th-gen rigs have got
> very attractive rates just in the right markets. So if the market
> requires a certain specification and the 6th-gen rigs qualify for
> that, then they do achieve very well. At the moment, there's a lot
> of activity around the high-specification rigs. So specifically, the
> Gulf of Mexico and some places in West Africa, that's where
> you've seen the rates really accelerate because the availability of
> these high-specification units is becoming more and more scarce.
> And the net effect of that is essentially we're securing very solid
> rates on the high-specification 7th-gen units, but that also trickles
> down to the 6th-gens when they end up being the only ones that
> are left. So I think you're going to see a pretty positive outlook for
> those rigs in the future.*** (Emphasis added)

97.     The statements above contained in the Fleet Status Report, Q1 2024 10-Q and

conference call were false and/or materially misleading because it concealed and

misrepresented the true state of Transocean's assets, specifically Transocean's rig asset

classification. In truth, the *Discoverer Inspiration* was in a dilapidated condition and was not

expected to earn another contract. Therefore, it was not readily available for operations, was

considered a non-strategic asset by Transocean, and its recorded asset valuation was

overstated. Similarly, the *Development Driller III* was not considered a strategic asset and its

recorded asset valuation was overstated as well. Transocean's financial projections for 2024 did not include any revenue for either of these vessels. The overstatement of their value was only revealed in September 2024, when Transocean disclosed that it had sold them for less than half their recorded value.

*July 24-August 1, 2024*

98.    On July 24, 2024, Transocean published a report entitled "Transocean Fleet Status Report," which included information about drilling rig status and contracts. The report listed the *Discoverer Inspiration* and the *Development Driller III* as "Idle." This meant they were "between drilling contracts, readily available for operations, and operating costs are typically at or near normal operating levels."

99.    On July 31, 2024, Transocean published its second quarter 2024 financial results in a press release for the period ended June 30, 2024. The press release Transocean's second quarter 2023 adjusted net loss of $123 million. Thigpen stated, in relevant part:

> The entire Transocean team executed well in the second quarter, delivering strong uptime performance for our customers, which drove revenue efficiency to 97% and produced 33% Adjusted EBITDA margins. In addition, the team recently secured a number of meaningful contracts, which are illustrative of current industry dynamics and reinforce our view that we are in an increasingly tightening market. Of these contracts, we are especially excited to continue 20K operations with Beacon in the U.S. Gulf of Mexico.
>
> As we continue to secure work for our fleet, our focus remains on optimizing our portfolio of assets to maximize EBITDA and generate free cash flows, which we can use to de-lever the balance sheet.

100.    The press release also included Transocean's purported assets, in pertinent part:

| | June 30, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 475 | $ 762 |
| Accounts receivable, net of allowance of $2 at June 30, 2024 and December 31, 2023 | 607 | 512 |
| Materials and supplies, net of allowance of $197 and $198 at June 30, 2024 and December 31, 2023, respectively | 440 | 426 |
| Restricted cash and cash equivalents | 400 | 233 |
| Other current assets | 213 | 193 |
| Total current assets | 2,135 | 2,126 |
| | | |
| Property and equipment | 24,066 | 23,875 |
| Less accumulated depreciation | (6,983) | (6,934) |
| Property and equipment, net | 17,083 | 16,941 |
| Contract intangible assets | — | 4 |
| Deferred tax assets, net | 30 | 44 |
| Other assets | 1,077 | 1,139 |
| Total assets | $ 20,325 | $ 20,254 |

101.    On August 1, 2024, Transocean published its quarterly report for the period ended June 30, 2024 on a Form 10-Q filed with the SEC (the "Q2 2024 10-Q"), affirming the previously reported financial results.

102.    In the consolidated financial statements filed with the Q2 2024 10-Q, Transocean disclosed that the company had $24.066 billion in property and equipment.

103.    Also on August 1, 2024, Transocean hosted an earnings call on which Transocean executives discussed earnings and results for the second quarter 2024. In his opening remarks, Thigpen stated:

> With these contracts, our working fleet is more than 90% committed through the end of 2025. And based upon advanced discussions with our customers and reflecting LOis and strong verbal commitments, we believe that aside from some small activity gaps, which could arise in our customer drilling programs, *our fleet that is currently working could soon be completely booked well into 2026. As such, our customers may soon need to consider financing the reactivation of cold stacked assets to meet their future program requirements.* (Emphasis added).

104.    In the same earnings call, President & COO Keelan I. Adamson added the following remarks:

We believe it is likely the entire West Africa region will require at least 4 additional Deepwater rigs from 2026 onwards, which could possibly require the reactivation of some currently cold stacked assets.

105.    In the same earnings call on August 1, 2024, in response to a question from an analyst about the right opportunities for Transocean's two idle rigs the Discoverer Inspiration and Development Driller III, Executive VP & Chief Commercial Officer Roddie Mackenzie responded, in pertinent part:

**I think, as we said before, we're basically going to only put them** [the *Development Driller III* and the *Discoverer Inspiration*] **on the right opportunities, but we're not going to try and compete with them for short-term mark.** *So we're basically keeping them drive for longer opportunities*.

[Emphasis added].

106.    In response to the same question, President & COO Keelan I. Adamson added:

And I guess also that *while the rigs would technically be characterized as warm-ish, we've taken a number of steps to ensure that they are marketable, but the costs associated with keeping them in that condition are as low as possible.* (Emphasis added)

107.    The statements above contained in the Fleet Status Report, press release, Q2 2024 10-Q, and conference call were false and/or materially misleading because it concealed and misrepresented the true state of Transocean's assets, specifically Transocean's rig asset classification. In truth, the *Discoverer Inspiration* was in a dilapidated condition and was not expected to earn another contract. Therefore, it was not readily available for operations, was considered a non-strategic asset by Transocean, and its recorded asset valuation was overstated. Similarly, the *Development Driller III* was not considered a strategic asset and its recorded asset valuation was overstated as well. Neither the *Discoverer Inspiration* nor the *Development Driller III* were "warm-ish" and both would be sold for less than half their

recorded value one month later.

108.    On September 3, 2024, before the market opened, Transocean published a press release announcing its decision to dispose of non-strategic assets. In particular, Transocean had agreed to sell the *Development Driller III* and the *Discoverer Inspiration* and associated assets for an aggregate $342 million. The press release stated, in pertinent part:

> ***On September 3, 2024, as part of our ongoing efforts to dispose of non-strategic assets, Transocean Ltd. (the "Company") announced that a subsidiary of the Company entered into agreements (the "agreements") with a third party to sell the Development Driller III and associated assets for $195 million and the Discoverer Inspiration and associated assets for $147 million. The Company expects the sale of these assets, for an aggregate $342 million, will result in an estimated non-cash charge for the third quarter 2024 ranging between $630 million and $645 million associated with the impairment of such assets.***
>
> The transactions contemplated by the agreements are subject to customary closing conditions and are expected to close in the third quarter of 2024. The Company intends to use substantially all of the proceeds from these transactions to repay existing indebtedness.
>
> [Emphasis added].

109.    Investors and analysts reacted immediately to Transocean's revelation. The price of Transocean's common stock declined dramatically. From a closing market price of $4.74 per share on August 30, 2024, Transocean's stock price fell to $4.32 per share on September 3, 2024, a decline of over 8%.

### *October 31, 2024*

110.    On October 31, 2024, Transocean filed its quarterly report on Form 10-Q with the SEC reporting its financial and operating results for the quarter ending September 30, 2024 (the "Q3 2024 10-Q).

111.    In the consolidated financial statements filed with the Q3 2024 10-Q,

Transocean disclosed that it had $22.412 billion in property and equipment. In discussing the impairments of *Discoverer Inspiration* and *Development Driller III* during the third quarter 2024, Transocean reported that:

> [It] recognized a loss of $629 million ($617 million or $0.64 per diluted share, net of tax) and $772 million ($755 million or $0.82 per diluted share, net of tax), respectively, associated with the impairment of the ultra-deepwater floaters Deepwater Nautilus, Development Driller III and Discoverer Inspiration, together with related assets, which we determined **were impaired at the time that we classified the assets as held for sale.**
>
> *    *    *
>
> **Loss on impairment of assets—**In the three months ended September 30, 2024, **we recognized a loss of $629 million** associated with the impairment of Development Driller III and Discoverer Inspiration together with related assets.

(Emphases added)

### *Transocean and the Individual Defendants acted with Scienter*

112.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Transocean common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire

Transocean's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

113.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Transocean's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

114.    By virtue of their positions at Transocean, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

115.    The misrepresentations alleged herein were made by the Individual Defendants while they were in possession of material, non-public information that contradicted public statements and/or rendered them materially false and misleading.

116.    The Individual Defendants knew that the *Discoverer Inspiration* and

*Development Driller III* were not considered strategic assets, and that therefore, Transocean's categorization and recorded asset valuations for the *Discoverer Inspiration* and *Development Driller III* were misleading and overstated.

117.    Specifically, the *Discoverer Inspiration* and *Development Driller III* were two of Transocean's 36 vessels. As set forth above, senior management of Transocean, including the Individual Defendants regularly monitored and reviewed the status of the Transocean vessels including the rating of their condition.

118.    Further the decision as to whether a rig would be stacked, or moved, or sold, was important enough that Transocean's top executives, including the Individual Defendants, was not only aware of the decision, but would have been involved in the decision itself.

119.    As such, all Individual Defendants had access to relevant operational and business information, and knew that the *Development Driller III* and *Discoverer Inspiration* were no longer strategic assets, and that representations that these assets were "waiting for the right opportunities" were false, and in fact, the assets would eventually be sold for scrap.

120.    Transocean and the Individual Defendants were motivated to delay disclosure of the decision to regard the *Discoverer Inspiration*  and *Development Driller III* as non-strategic and being offered for sale for as long as possible as it enabled Transocean to defer disclosing the impairment of those vessels and the related recognition of an impairment expense in Transocean's financial statements.

121.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the

senior managers of Transocean, the Individual Defendants had knowledge of the details of Transocean's internal affairs.

## CLASS ACTION ALLEGATIONS

122.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Transocean's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

123.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Transocean's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Transocean or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 24, 2024, there were 875.88 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

124.    Plaintiff's claims are typical of the claims of the members of the Class as

all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

125.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

126.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Transocean;

(c)    whether the Individual Defendants caused Transocean to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Transocean's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

127.    A class action is superior to all other available methods for the fair and

efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **COUNT I**

### **Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder**

128.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

129.    As set forth with particularity above, during the Class Period, Transocean and the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did (1) deceive the investing public including Plaintiff and other class members, as alleged herein; and (2) cause Plaintiff and other Class members to purchase or sell Transcocean securities at inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, each of Transocean and the Individual Defendants took the actions set forth herein.

130.    Transocean and the Individual Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and sellers of Tesla's securities in an effort to artificially affect the price of Tesla securities in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.

### *Presumption of Reliance; Fraud-On-The-Market*

131.    At all relevant times, the market for Transocean's common stock was an efficient market for the following reasons, among others:

(a)    Transocean's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Transocean communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Transocean was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Transocean was reflected in and incorporated into the Company's stock price during the Class Period.

132.    As a result of the foregoing, the market for Transocean common stock promptly digested current information regarding it from all publicly available sources and reflected such information in Transocean's stock price. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Transocean's common stock was artificially inflated throughout the Class

Period. In ignorance of the adverse facts concerning Transocean which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Transocean's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby. All purchasers of Transocean's common stock during the Class Period suffered similar injury through their purchase of Transocean's common stock at artificially inflated prices, and a presumption of reliance applies.

### *Loss Causation and Economic Loss*

133.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Transocean's common stock and operated as a fraud or deceit on Class Period purchasers of Transocean's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Transocean's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Transocean's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages under federal securities laws.

134.    During the Class Period, Transocean's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Transocean's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they

would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Transocean's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Transocean's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

*No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

135.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with material information concerning the Company's rigs and other financial assets. These statements were not forward-looking and/or omitted material information about existing events and circumstances.

136.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

137.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Transocean who knew that the "forward- looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to

any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

138.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

139.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Against the Individual Defendants
### for Violations of Section 20(a) of the Exchange Act

140.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

141.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Transocean's misstatements.

142.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct

promptly any public statements issued by Transocean which had become materially false or misleading.

143.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Transocean disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Transocean to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Transocean's common stock.

144.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Transocean to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

145.    By reason of the above conduct, the Individual Defendants and/or Transocean are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class Representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 7, 2025                          Respectfully submitted,

                                             **LEVI & KORSINSKY, LLP**


                                             _/s/ Nicholas Porritt_____
                                             Nicholas I. Porritt
                                             nporritt@zlk.com
                                             Adam M. Apton
                                             33 Whitehall Street,
                                             27th Floor New York,
                                             New York 10004 Tel.:
                                             (212) 363-7500
                                             Fax: (212) 363-7171

                                             *Attorneys for Lead Plaintiff*