USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/24/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re TRANSOCEAN SECURITIES LITIGATION

24 Civ. 9964 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, John Mahoney, brings this federal securities class action on behalf of all investors who purchased Transocean Ltd. ("Transocean") securities between May 1, 2023, and September 2, 2024 (the "Class Period"). *See* Amended Compl. ("AC") ¶ 1, ECF No. 38. Transocean is a Swiss-based, publicly-traded global offshore drilling company that generates revenue by leasing its drilling rigs to oil and gas companies. *See id.* ¶¶ 13, 21. Plaintiff alleges that Transocean, led by its C-Suite executives Thad Vayda, Mark Mey, and Jeremy Thigpen (the "Individual Defendants," and collectively with Transocean, "Defendants"), violated federal securities laws when they knowingly or recklessly provided investors with false or misleading information concerning the working condition and operating status of two Transocean rigs. *See id.* ¶¶ 2, 14–16. Plaintiff alleges that Defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). *See id.* ¶¶ 128–49. Before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Mot., ECF No. 47; Mem., ECF No. 48; *see also* Opp., ECF No. 52; Reply, ECF No. 53; Sur-Reply ECF No. 58. For the reasons stated below, the motion is GRANTED without prejudice.

## BACKGROUND

I. Factual Background[1]

Transocean is a global offshore drilling company with its principal executive offices located in Switzerland. AC ¶¶ 13, 21. Transocean's stock trades on the New York Stock Exchange. *See id.* ¶ 13. During the Class Period, Thigpen was Transocean's Chief Executive Officer. *Id.* ¶ 14. Mey served as Chief Financial Officer from May 2015 until May 20, 2024. *Id.* at ¶ 15. Vayda was Chief Financial Officer from May 20, 2024, onwards. *Id.* ¶ 16.

Transocean's principal business is contracting out its rigs to oil and gas companies. *See id.* ¶ 21. Transocean possesses two classes of rigs: (1) Drillships which are "floating vessels that are shaped like conventional ships, generally self-propelled and considered to be the most mobile of the major rig types" and (2) semi-submersibles which "are a specialized type of vessel that can float in a partially submerged state, with its main hull below the waterline and the deck above the waterline." *Id.* ¶¶ 22, 25; *see also* Mem. at 8. During the Class Period, Transocean operated a fleet of approximately thirty-four mobile offshore drilling rigs. *See id.* ¶ 21. Two rigs are at issue in this action: *Discoverer Inspiration* ("*Inspiration*"), a drillship, which entered service in 2010, and *Development Driller III* ("*DD3*"), a semi-submersible, which entered service in 2009. *See id.* ¶¶ 2, 22, 25.

Transocean categorizes its rigs as "under contract, 'idle,' or 'stacked.'" *Id.* ¶ 21. An "idle" rig is "between drilling contracts, readily available for operations, and operating costs are

[1] The facts are taken from the Plaintiff's AC. For the purposes of determining Defendants' motion to dismiss, the Court assumes that all well-pleaded facts alleged in the AC are true. *See Galper v. JP Morgan Chase Bank*, 802 F.3d 437, 443–44 (2d Cir. 2015). An exception to this rule is where a factual assertion in the complaint is "contradicted by the complaint itself, by documents upon which the pleadings rely, or by facts of which the court may take judicial notice." *Perry v. NYSARC, Inc.,* 424 Fed. App'x 23, 25 (2d Cir. 2011) (summary order); *see also Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1095 (2d Cir. 1995) (upholding a dismissal where "attenuated allegations" supporting a claim were "contradicted both by more specific allegations in the [c]omplaint and by facts of which [the court] may take judicial notice").

typically at or near normal operating levels." *Id.* ¶¶ 28, 66. A "stacked rig" is "(a) preparing for an extended period of inactivity, (b) expected to continue to be inactive for an extended period, or (c) completing a period of extended inactivity" and "is staffed by a reduced crew or has no crew." *Id.* ¶ 28. A rig's operating status affects whether it is individually tested for impairment in Transocean's financial accounting. *Id.* ¶¶ 29–30. When Transocean classifies a rig as "held for sale" for accounting purposes, that rig is considered "impaired to the extent its carrying amount exceeds its estimated fair value less cost to sell." *Id.* But an "idle" rig is listed as "held and used" for accounting purposes, *see* Opp. at 1, and "held and used" rigs are not tested for impairment on a rig-by-rig basis. *See* AC ¶ 30; Opp. at 1–2; *see also* Mem. at 8–9.[2] Transocean, therefore, does not evaluate or note in its accounting whether individual "idle" rigs are impaired.

In April 2023, after *Inspiration* concluded a contract for Hess Corporation, Transocean marked her as "idle" on its "Fleet Status Report"—a publicly available disclosure that is filed quarterly with the Security and Exchange Commission ("SEC"). *Id.* ¶¶ 23, 28; *see also* Mem. at 5. In August 2023, Transocean categorized *DD3* as "idle" after she concluded a contract with TotalEnergies. *Id.* ¶¶ 26, 28. Both rigs remained listed as "idle" throughout the Class Period. *See id.* ¶ 98 (both rigs listed as "idle" in the July 24, 2024 Fleet Status Report, the last report before the rigs' sale was announced in September 2024).

Throughout the Class Period, Transocean employees, including Vey and Thigpen, made comments suggesting that *Inspiration* and *DD3*, commensurate with their "idle" status, were "readily available for operations." *Id.* ¶ 2. On Transocean's May 2, 2023 earnings call, Thigpen stated that Transocean was in "active dialogue" regarding opportunities for rigs, including

---

[2] An impairment would only be noted for "held and used" rigs if an impairment existed for that entire class of rig, *i.e.*, drillships or semi-submersibles. *See* AC ¶ 30; Opp. at 1–2; *see also* Mem. at 8–9.

*Inspiration*. *Id*. ¶ 63. Transocean's Executive Vice President and Chief Executive Commercial Officer, Roddie Mackenzie, echoed those sentiments on the call, stating that Transocean was "in discussions and part of tenders on a couple of things for the [*I]nspiration* . . . [and that] there are a couple of interesting things on the horizon." *Id*. ¶ 64. On a February 20, 2024 earnings call, Thigpen stated that for both *DD3* and *Inspiration*, Transocean had "got [the rigs] bid into several different things" and that "[t]here are several opportunities . . . even if there is some additional idle time on those rigs." *Id*. ¶ 84. On an April 30, 2024 earnings call, Transocean President and COO Keelan Adamson stated that *Inspiration* was "not stacked, she's idle" and that *DD3* was "idle in Aruba and waiting for its next opportunity." *Id*. ¶ 94. On the same call, Mackenzie concurred, stating that Transocean was "looking to make sure that we get the right opportunity to put the [*Inspiration* and *DD3*] to work long term rather than moving them to short term to work." *Id*. ¶ 95. On an August 1, 2024 earnings call, Adamson stated that Transocean had "taken a number of steps to ensure [*Inspiration* and *DD3*] are marketable." *Id*. ¶ 106. Transocean also put out various accounting statements during the Class Period that listed *Inspiration* and *DD3* as rigs that were "held and used" as opposed to "held for sale." *Id.* ¶¶ 70, 76, 81, 92.

On September 3, 2024, Transocean announced that "it had agreed to sell [*DD3*] and [*Inspiration*] . . . [for] less than half the value that Transocean had previously recorded as reflecting the fair market value of the vessels." *Id.* ¶ 4. The announcement was followed by Transocean's share price dropping over 8% from $4.74 per share on August 30, 2024, to $4.32 per share on September 3, 2024. *Id.* ¶ 5.

Plaintiff alleges that during the Class Period, Defendants "disseminat[ed] false and materially misleading statements and/or conceal[ed] material adverse facts concerning the true state" of *Inspiration* and *DD3*. *Id.* ¶ 3. Specifically, Plaintiff claims that the two rigs were not

truly "idle" and ready to be contracted out but instead were "in such a poor condition that [they were] not expected to obtain a new contract from any Transocean customer, and, accordingly, their recorded asset valuations were overstated." *Id*. Plaintiff's AC includes the statements of seven anonymous Transocean former employees ("FEs") to support his contention that (1) during the Class Period *Inspiration* and *DD3* were in dire physical condition, and that (2) the Individual Defendants and senior leadership were aware of this, and, contrary to their public assertions, were not actually seeking new leasing opportunities.

FE1, FE2, FE3, and FE4 each describe *Inspiration*'s condition during the Class Period. FE1, who "worked in the project sector of Transocean's accounting department from April to October 2024," stated that neither rig had "repair projects ongoing during her tenure at Transocean." *Id.* ¶ 31. FE2, who worked on *Inspiration* from January 2023 to February 2024, stated that *Inspiration* had turned into a "rust bucket" and "it was visually apparent that [she] was in such a poor state that it would not [be] worth it for Transocean to invest money repairing [her]." *Id.* ¶ 32. FE3, Transocean's Director of Technical Services and Engineering from September 2018 to March 2024, stated that *Inspiration* was "de-manned completely in fall 2023," and that the CEO and CFO would be involved in the decision to "divest a rig." *Id*. ¶¶ 33–35. FE4, who "worked as a dynamic positioning operator" from December 2021 to May 2023, stated that workers on *Inspiration* "knew its contract would not be renewed, and the rig was most likely going to be stacked" due to major required repairs. *Id*. ¶¶ 40–42.

FE5, FE6, and FE7 worked on *Inspiration* or *DD3* prior to the Class Period and provide general insights into Transocean's management operations. FE5 was "a subsea department employee from 2011 – 2021" on *Inspiration* and "confirmed that the decision to deem a rig non-strategic came from Transocean's executives and named Thigpen and other corporate officers as

those who made such decisions." *Id.* ¶ 43. FE6, who between 2013 and 2023 "worked as a subsea engineering superintendent" on *DD3* and as "a senior subsea engineer" on *Inspiration*, stated that "the decision to scrap an asset would have come from the COO level or above." *Id.* ¶¶ 44–47. Finally, FE7 visited *Inspiration* in 2018, 2019, and 2020, prior to the Class period, and said the rig was "operable, but in poor condition" in 2018 and "rusty" and "run down" by 2020. *Id.* ¶¶ 51, 53, 56.

Plaintiff argues that the FEs' statements, taken together, show that the Individual Defendants were aware that *Inspiration* and *DD3* were in dire physical condition during the Class Period and that Defendants did not intend to contract them out again. Defendants, in Plaintiff's telling, fraudulently misled the investing public when they characterized the two rigs as "idle" and "held for use" in filings and public statements during the Class Period.

## II. Procedural Background

In the months following the September 2024 sell-off, multiple individuals filed related actions against Defendants. *See Matteson v. Transocean Ltd.*, No. 25 Civ. 1112 (S.D.N.Y. filed Feb. 7, 2025); Compl., ECF No. 1. The Court consolidated the related cases before it into this putative class action, appointing John Mahoney as lead plaintiff. *See* Consolidation Order, ECF No. 32, at 2. Plaintiff then filed the AC bringing claims against Transocean under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), as well as 17 C.F.R. § 240.10b–5 ("Rule 10b–5") promulgated thereunder, in addition to a claim against the Individual Defendants for violating § 20(a) of the Exchange Act, 15 U.S.C. § 78(a). *See* AC ¶¶ 128–45. Defendants move for an order dismissing the AC pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Mot.; Mem.

## LEGAL STANDARD

I. General Rule 12(b)(6) Motion to Dismiss Standard

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555. The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*. The Court must accept the allegations in the complaint as true and draw all reasonable inferences in the non-movant's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

II. Heightened Pleading Standard Under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA")

"A complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by stating with particularity the circumstances constituting fraud." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (citing 15 U.S.C. § 78u–4(b)(1)). "These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that 'plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed.'" *Sun v. TAL Educ. Grp.*, No. 22 Civ. 1015, 2023 WL 6394413, at *25 (S.D.N.Y. Sept. 29, 2023) (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)).

## III. External Documents

For the purposes of a motion to dismiss in a fraud action, a court may consider limited external material including (1) any statements or documents incorporated by reference in the complaint, (2) public disclosure documents that are required by law to be, and have been, filed with the SEC, and (3) documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit. *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir. 1996) (permitting consideration of the full text of documents cited in the complaint in a securities fraud action). This principle "prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting" that omits parts of the document that would undermine their claim. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

However, a "problem arises when a party seeks to introduce affidavits, depositions or other extraneous documents not set forth in the complaint." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). In those instances, a district court has the discretion to either "exclude[] the extrinsic documents" or "convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002); *see also Reyes v. Cnty. of Suffolk*, 995 F. Supp. 2d 215, 220 (E.D.N.Y. 2014) ("[W]hen a defendant attempts to counter a plaintiff's [c]omplaint with its own factual allegations and exhibits, such allegations and exhibits are inappropriate for consideration by the Court at the motion to dismiss stage.").

## ANALYSIS

I. <u>External Documents</u>

A. Defendants' Exhibits A–H

The Court first evaluates whether it may consider the eight exhibits submitted with Defendants' motion. *See* Regan Decl., ECF No. 49, Exs. A–H.

Exhibits A and B are the annual report sections of Transocean's Form 10-K, which it submitted to the SEC. *See* Regan Decl., Ex. A, B. Exhibit B, the 10-K for Fiscal Year 2023, is cited in Plaintiff's AC in multiple instances. AC ¶¶ 85–87. Therefore, it is proper for the Court to consider the full text of the annual report, as opposed to solely the sections cited by Plaintiff. *See San Leandro,* 75 F.3d at 808. On the other hand, Exhibit A, the 10-K for Fiscal Year 2024, is not cited in Plaintiff's AC. It was submitted to the SEC on February 18, 2025, which sits outside of the Class Period. *See* Regan Decl., Ex. A. The Court will not consider Exhibit A in determining the motion to dismiss.

Exhibit C consists of selected Fleet Status Reports from October 16, 2013, to July 24, 2024. *See* Regan Decl., Ex. C. Plaintiff cites the July 19, 2023, October 18, 2023, April 17, 2024, and July 24, 2024 Fleet Status Reports. AC ¶¶ 66, 73, 88, 98. The Court finds it appropriate to consider these Fleet Status Reports as well as the other Fleet Status Report from the Class Period—February 14, 2024—which is included as part of Exhibit C, and which was available to Plaintiff and other Transocean investors. *See* Regan Decl., Ex. C at 179–88, 192–98, 202–10, 214–22, 226–33. The Court will not consider the Fleet Status Reports in Exhibit C that were published prior to the start of the Class Period.

Exhibit D contains excerpts of Transocean's Form 10-Ks for the fiscal years ending in 2014, 2015, 2016, 2017, 2018, and 2021. *See* Regan Decl., Ex. D. Exhibit E is Transocean's

Form 8-K dated September 3, 2024. *See* Regan Decl., Ex. E. The documents contained in Exhibits D and E are not referenced in the AC and sit outside of the Class Period. The Court, therefore, will not consider Exhibits D and E at the motion to dismiss stage.

Exhibits F, G, and H are the full transcripts of the August 1, 2023, April 30, 2024, and February 20, 2024 earnings calls. Each of these calls was cited in the AC. *See* AC ¶¶ 71, 93–96, 82–84. Given that Plaintiff claims Defendants' comments on those three earning calls support his fraud claims, the Court reviews the entire transcripts.

In summary, the Court considers Exhibits B, F, G, and H in deciding the motion to dismiss, as well as the Fleet Status Reports from the Class Period in Exhibit C. The Court does not consider Exhibits A, D, or E or the Fleet Status Reports in Exhibit C that predate the Class Period.

B. The Nouth Declaration

Defendants, in their reply, provide a sworn declaration made by Bahaa El-Din Nouth, the former Director of Technical Services and Engineering at Transocean, whom the AC identified as FE3. *See* Nouth Decl., ECF No. 54-1. The Court does not consider the Nouth declaration because there is no legal authority for the proposition that, at the motion to dismiss stage, a movant may submit a declaration to refute statements attributed to a third party in a plaintiff's complaint. *See, e.g.*, *Garnett-Bishop v. New York Cmty. Bancorp, Inc.*, No. 12 Civ. 2285, 2014 WL 5822628, at *13 (E.D.N.Y. Nov. 6, 2014) (excluding affidavits from consideration at motion to dismiss stage).

II. <u>Rule 12(b)(6) Analysis</u>

Under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (per curiam) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)). The Court finds that Plaintiff has failed to plausibly allege scienter. The Court, therefore, grants Defendants' motion to dismiss without reaching the other five prongs. *See, e.g.*, *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 778 (S.D.N.Y. 2021) ("If Defendants have failed to plead scienter, the Court need not proceed further.").

A. Scienter Standard

A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The requisite state of mind in a section 10(b) and Rule 10b–5 action is an intent 'to deceive, manipulate, or defraud.'" *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007)). A plaintiff can establish the requisite scienter "by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. To proceed under the "motive and opportunity" theory, Plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000). Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute "motive" for purposes of this inquiry. *Id.* at 307. Rather, the

"motive" element is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit. *Id*. at 308; *see also ECA*, 553 F.3d at 198.

"Alternatively, if [p]laintiffs cannot make the 'motive' showing, then they [can] raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." *ECA*, 553 F.3d at 198–99 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). The Second Circuit has "defined recklessness as a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184–85 (2d Cir. 2014) (quoting *Novak*, 216 F.3d at 308, 312). "To state a claim based on recklessness . . . the complaint must 'specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements.'" *Maloney,* 518 F. Supp. 3d at 780 (quoting *Novak*, 216 F.3d at 308). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309. "Under this heightened pleading standard for scienter, a complaint will survive 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 237 (S.D.N.Y. 2023) (quoting *Tellabs, Inc.,* 551 U.S. at 323). "The Supreme Court dictates that the standard on a motion to dismiss is 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation,

meets that standard.'" *Employees' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 309 (emphasis in original) (quoting *Tellabs,* 551 U.S. at 323).

B. Scienter Application

1. Motive and Opportunity

Plaintiff fails to allege "motive," as required for the "motive and opportunity" theory. *See* Opp. at 27–29. Plaintiff states that although "the PSLRA does not require pleading motive, the [AC] alleges a clear one: 'to delay disclosure' of the massive, inevitable impairment charge 'for as long as possible' . . . thereby artificially maintaining the appearance of a stronger balance sheet." Opp. at 29 (quoting AC ¶ 120). But Plaintiff's "proffered motive is the same desire to maintain the appearance of profitability that [the Second Circuit has] consistently rejected as insufficient in securities fraud pleading." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *accord New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 49 (2d Cir. 2024). To make the requisite allegation of motive, Plaintiff "must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139. Plaintiff does not claim that any of the Individual Defendants personally gained from the purported fraud. Plaintiff fails, therefore, to allege scienter under the motive and opportunity theory.

2. Conscious Misbehavior or Recklessness

Plaintiff must, then, proceed by making a strong showing of "circumstantial evidence of [the Individual Defendants'] conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Plaintiff's scienter allegations rest primarily on the FEs' allegations, but no FEs claim that they interacted with the Individual Defendants regarding the decision to categorize *Inspiration* and *DD3* as "idle" and "held for use." *See* AC ¶¶ 31–59. Nor do the FEs allege they discussed the

condition of the rigs with the Individual Defendants or senior management. *See id.* Although this omission is not fatal, it means Plaintiff must identify some other basis for inferring scienter. *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615−16 (S.D.N.Y. 2015) (holding that "there is no baseline requirement" of contact between confidential witnesses and defendants for a court to credit the former's allegations); *Maloney,* 518 F. Supp. 3d at 780–81 ("In the absence of direct personal contact between the confidential witnesses and the Individual Defendants, Plaintiff[] must demonstrate scienter by other means."). The Court examines the statements of FE1, FE3, FE5, and FE7, which Plaintiff argues "establish a direct line of sight to executive-level knowledge" and demonstrate the FEs' "knowledge of the *process* by which information flowed and the level at which decisions were made." Opp. at 28–29 (emphasis in original).

Plaintiff's scienter argument gains no support from FE1's core claims—that Thigpen had to approve "every repair project costing at least $5 million" and that *Inspiration* and *DD3* "had no repair projects ongoing during her tenure at Transocean," which lasted from April to October 2024 (less than 50% of the eighteen-month Class Period).[3] AC ¶ 31. First, the contention that Thigpen approved repairs costing at least $5 million is a red herring because Plaintiff does not allege that either rig had a $5 million repair presented to Thigpen during the Class Period. Second, Plaintiff does not allege how Thigpen or the other Individual Defendants were informed of the rigs' condition or their need for repairs. *See supra* 16−17. And, even assuming the

[3] Plaintiff in his opposition brief twice appears to stretch FE1's claim that no repairs happened during her "tenure" at Transocean, which lasted from "April to October 2024," AC ¶ 3, to instead claim no repairs were made to either rig in *all* of 2024. *Compare* AC ¶ 31 (neither *Inspiration* nor *DD3* had "repair projects ongoing during her tenure at Transocean"), *with* Opp. at 22 (claiming there was an "absence of any 2024 repair projects for either rig (FE1)" (emphasis omitted)), *and* Opp. at 28 (citing AC ¶ 31 and claiming "no such repair budgets existed for the rigs in 2024"). Moreover, FE2's statements indicate that *Inspiration* did undergo repairs January 2024. *See* AC ¶ 32 ("FE2 worked on a ship anchored near [*Inspiration*], *while both were being repaired*, in December 2023 – January 2024.") (emphasis added).

Individual Defendants knew that *Inspiration* and *DD3* were not being repaired from April to September 2024, this does not give rise to a strong inference of recklessness. *See* Opp. at 20, 22. Transocean's definition of "idle" does not require that repairs be ongoing at all times, and Plaintiff does not point to any public document or statement by the Individual Defendants claiming that repairs were taking place on either *Inspiration* or *DD3* between April and September 2024.[4] To the degree that Plaintiff argues that "idle" rigs have "operating costs . . . at or near normal levels," which would necessarily include costs for ongoing repairs, the Court finds that Plaintiff makes no claim as to what typical operating costs were for the rigs or that those costs were abnormally low during the Class Period. Opp. at 18. The Court, therefore, finds that even if the Individual Defendants were aware that *Inspiration* and *DD3* were not repaired from April to September 2024, that does not support a strong showing of recklessness.

Next, FE3's statements do not establish that the Individual Defendants knew of the alleged dire physical conditions of *Inspiration* and *DD3*. First, FE3 claims that "throughout the Class Period, each Transocean vessel was given an internal rating based on its condition [that] was provided to Thigpen and Transocean's Chief Operating Officer." AC ¶ 39. In addition, FE3 states that "Transocean's Senior Vice-President of Marketing maintained a Bid Assessment Sheet which contained details of potential bids for contracts for Transocean vessels [which] was provided to Thigpen and Transocean's Chief Operating Officer for final assessment." *Id*. All Plaintiff alleges is that *Inspiration* and *DD3* received "an internal rating based on [their] condition" and that those ratings were provided to Thigpen. There is no allegation that FE3 saw

---

[4] For example, in its publicly-released 2023 Form 10-K, Transocean alerts investors that "[s]ome idle rigs . . . require additional costs to return to service" and that "[t]he actual cost to return to service, which in many instances could be significant and could fluctuate over time, depends upon various factors, including . . . the extent of repairs." Regan Decl., Ex. B, at 2–3. In addition, Transocean's 2023 10-K also discloses to investors that "WE MUST MAKE SUBSTANTIAL CAPITAL AND OPERATING EXPENDITURES TO REACTIVATE OUR STACKED OR IDLE FLEET AND TO MAINTAIN OUR ACTIVE FLEET." *Id*. at 9 (all caps in original).

the internal rating for either rig or, more importantly, that the internal rating on either rig was poor. *See Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 413 (S.D.N.Y. 2007) (finding unpersuasive the fact that senior management received regular reports when plaintiffs failed to allege that the reports contained information contrary to managements' public statements). The AC also presents no information on who created the ratings, at what level of detail, or how the ratings were conveyed to senior management. Although Plaintiff contends that FE3 "confirmed management received *regular* reports and assessments of the physical condition of each rig," Opp. at 27 n.3 (emphasis added), FE3's actual statements in the AC do not specify the frequency the reports were provided. *See* AC ¶¶ 33–39. Thus, Plaintiff has failed to "establish what specific contradictory information the Individual Defendants received or when they received it." *Local No. 38 Int'l Bhd. Of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010). These deficiencies are equally applicable to the "Bid Assessment Sheet" allegedly provided to Thigpen. "[A]s with all allegations going to scienter, confidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements." *Glaser v. The9, Ltd.,* 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011). FE3's statements regarding the Individual Defendants knowledge of the rigs' condition fails to satisfy this requirement.

The Court also finds unavailing FE3's claim that *Inspiration* "was de-manned completely in fall 2023" and that "there was a technical decision to be taken, that we tow the rig across the Atlantic, like a dead ship, and pull thrusters in Las Palmas, and offer the rig for scrap." AC ¶ 34. The Court begins by noting that FE2 is alleged to have worked on *Inspiration* "from January 2023 to February 2024." AC ¶ 32. This contradicts FE3's claim that *Inspiration* "was de-

manned completely in fall 2023." AC ¶ 34.[5] In addition, FE3 states only that "a technical decision [to] offer the rig for scrap" was "*to be taken*," not that Transocean actually made such a decision in fall 2023.[6] *Id.* ¶ 34 (emphasis added). The Court finds that these inconsistent and vague allegations do not plausibly support a strong inference that *Inspiration* was stacked in fall 2023, and Plaintiff offers no other basis for such a conclusion.

Because Plaintiff's contention that *Inspiration* was stacked in fall 2023 is insufficiently pleaded, FE5 and FE7's claim that "decisions to stack or designate a rig non-strategic were made at the highest executive levels, specifically naming Defendant Thigpen," Opp. at 28–29, has no bearing on the Individual Defendants' scienter with respect to alleged misrepresentations involving *Inspiration*. Additionally, the Court identifies considerable weaknesses with respect to the claims made by FE5 and FE7.

For one, the AC does not allege enough facts about FE5 to establish that FE5's allegations are plausible. The Second Circuit has held that "[a] complaint may rely on information from confidential witnesses if 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Employees' Ret.*, 794 F.3d at 305 (quoting *Novak,* 216 F.3d at 314). Paragraph forty-three contains the only mention of FE5 in the AC:

---

[5] Plaintiff seeks to rectify the inconsistency in his opposition by stating that a rig being "'de-manned'" "does not preclude dockyard contractors or skeleton personnel performing tow-out, preservation, or thruster-removal work." Opp. at 21. Plaintiff does not cite authority for his definition of "de-manned," and the AC's use of the adjective "completely" following "de-manned" implies a total removal of employed individuals from the rig. In addition, the AC describes FE2 as "work[ing] on" *Inspiration* from "January 2023 to February 2024"—over a year, which cuts against the notion that FE2 was employed as a "dockyard contractor[]" or "skeleton personnel" in the winter of 2023–24. Plaintiff concedes that "while FE2 observed repairs at year-end 2023. . . . [t]here is no inconsistency: rigs can be slated for stacking and still undergo limited work to preserve or prepare them for tow or sale." Opp. at 21. Maybe so, but the AC gives no indication that FE2 observed "work to preserve or prepare [*Inspiration*] for tow or sale," stating only that the rig was "being repaired." AC ¶ 32.

[6] FE3 also states that because the decision "to divest a rig was such a large decision, . . . the "CEO . . . and CFO were definitely involved." AC ¶ 35. These are mere allegations that Defendants 'would have' or 'should have' had knowledge" of any decision to "divest" *Inspiration*, which are "insufficient" under the heightened pleading standard applicable to securities fraud actions. *Glaser,* 772 F. Supp. 2d at 591.

> FE5 worked as a subsea department employee from 2011 – 2021 on [*Inspiration*]. FE5 confirmed that the decision to deem a rig non-strategic came from Transocean's executives and named Thigpen and other corporate officers as those who made such decisions.

AC ¶ 43. There is no description of the roles or responsibilities of "a subsea department employee," nor of the basis for FE5's knowledge. FE5 also appears to have worked "on" *Inspiration* and far from Transocean's decision-making nucleus in Switzerland, casting further doubt as to FE5's knowledge of how strategic business decisions were made. *See Feasby v. Industri-Matematik Int'l Corp.*, No. 99 Civ. 8761, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003) (discounting a confidential witness because the complaint did not "describe the position held by or work assignments of the former employee or consultant sources, or any other information that would support an inference that the sources would possess the information attributed to them"). Finally, FE5 worked on *Inspiration* from 2011–2021, prior to the Class Period, AC ¶ 43, further undermining FE5's capacity to provide "circumstantial evidence of conscious misbehavior or recklessness" during the relevant time, *ECA*, 553 F.3d at 198.

With respect to FE7, the AC alleges:

> FE7 stated that with respect to the decision to stack a rig, Paul Johnson, Keith Miller, Jeremy Thigpen, Jeff Richardson, or Ramsey Richardson were those at Transocean who would be involved in such a decision.

AC ¶ 57. FE7's statement cuts *against* an inference of the Individual Defendants' scienter. FE7 uses the disjunctive "or" when describing the individuals "who would be involved" in the decision to stack a rig as opposed to the conjunctive "and." Thus, a fair reading of FE7's insights is that Thigpen may or may not have been part of the decision to stack a rig. In addition, FE7's statement implies that the other two Individual Defendants, Vayda and Mey, were not part of these decisions. Lastly, the Court treats FE7's statement that top executives "would be

involved in such a decision" as the type of "speculat[ive] and conclusory allegations" that have long been held improper building blocks for a scienter argument. *Kalnit*, 264 F.3d at 142.

In addition to the FEs' statements, Plaintiff relies on statements made by the Individual Defendants and the purported importance of *Inspiration* and *DD3* to Transocean to allege scienter. Plaintiff argues that "the operational status, maintenance, and billion-dollar valuation of Transocean's fleet are not trivial, peripheral matters; they are the 'core' of its business" which "weighs heavily on the side of a culpable inference." Opp. at 27–28. Plaintiff appears to invoke the "core operations" theory to prove scienter.[7] Under that theory, "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *In re Supercom Inc. Sec. Litig.*, No. 15 Civ. 9650, 2018 WL 4926442, at *31 (S.D.N.Y. Oct. 10, 2018) (citation and internal quotation marks omitted). But "while allegations regarding core operations may factor into a court's holistic assessment of scienter allegations, they are not independently sufficient to raise a strong inference of scienter." *In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 Civ. 7840, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018) (citation and internal quotation marks omitted), *aff'd*, 764 F. App'x 127 (2d Cir. 2019). Although there is no brightline rule, "courts have required that the operation in question constitute nearly all of a company's business before finding scienter based on the 'core operations doctrine.'" *Tyler v. Liz Claiborne, Inc.*, 814 F.Supp.2d 323, 343 (S.D.N.Y. 2011). Plaintiff attempts to define Transocean's "core operation" as "the operational status, maintenance, and billion-dollar valuation of Transocean's *fleet*." Opp. at 27–28 (emphasis added). But Plaintiff has not claimed

[7] The Second Circuit has not directly addressed the "core operations" theory. *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) ("[W]e have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives [the enactment of the PSLRA] as a viable theory of scienter.").

wide-ranging fraud with regard to Transocean's entire fleet; rather, Plaintiff alleges misrepresentation only with respect to two specific rigs out of thirty-four in total.[8] This sinks Plaintiff's "core operation" argument.

Finally, Plaintiff argues that "the statements made by members of Transocean management during the [C]lass [P]eriod that they were monitoring . . . *Inspiration* and . . . *DD3* create a compelling inference that they were aware of, or deliberately reckless towards the physical condition and thus operational readiness of the rigs." Opp. at 27. The Court notes that the AC cites no statement from any Transocean executive that describes the physical condition of *Inspiration* or *DD3* or that indicates the executive was monitoring the condition of the two rigs. The Court also does not find Transocean officials' public statements regarding potential contract opportunities for *Inspiration* and *DD3* to be inconsistent with the two rigs needing repairs to be made before starting a new contract. As discussed, the 2023 10-K disclosed to investors that "idle" rigs might require significant repairs before returning to service. *See infra* 15 n.4.

Viewed collectively under the heightened pleading standard of Rule 9(b) and the PSLRA, the amended complaint does not give rise to a strong inference of recklessness and thus fails to plead scienter.[9] Because Plaintiff "fail[ed] to plead scienter with respect to the [I]ndividual [D]efendants, [P]laintiff[] also fail[s] to establish that [Transocean] acted with corporate scienter." *Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 503 (S.D.N.Y. 2013); *see also Teamsters Local 445*, 531 F.3d at 195 (holding that, in order

---

[8] Plaintiff has not disputed that "the impairment charge amounted to less than 3% of the [Transocean's] reported gross asset values." Reply at 7.

[9] Moreover, the inference of scienter that Plaintiff attempts to draw from its asserted facts is not as compelling as the opposing inference, *see Tellabs, Inc.,* 551 U.S. at 323, that Transocean validly categorized *Inspiration* and *DD3* as "idle" and explored new contracts for them, before "ultimately decid[ing] it would sell the rigs and promptly disclos[ing] that decision and its corresponding financial impact." Mem. at 26; *see also* Ex. B at 5 (2023 Form 10-K advising investors that Transocean "may not be able to . . . obtain drilling contracts for our stacked and idle rigs.") (original in caps).

to plead corporate scienter, a plaintiff must establish "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter").

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's AC is GRANTED.[10] This action is dismissed without prejudice.[11] By **October 22, 2026**, Plaintiff may amend his complaint if his desires. If Plaintiff does not amend his complaint, the dismissal shall operate with prejudice. The Clerk of Court is directed to terminate all pending motions.

SO ORDERED.

Dated: September 24, 2026
New York, New York

ANALISA TORRES
United States District Judge

[10] The Court dismisses Plaintiff's claim under Section 20(a) of the Exchange Act because such a claim is "necessarily predicated on a primary violation of securities law," which the Court has concluded did not exist. *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004).

[11] The Court grants its dismissal without prejudice given our Circuit's strong preference for granting parties' leave to amend following a court's first ruling. *See, e.g.*, *New York Communities for Change v. New York State Unified Ct. Sys./Off. of Ct. Admin.*, 680 F. Supp. 3d 407, 415 (S.D.N.Y. 2023).